**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Larry Everett SHOUPE and Craig Whitman Williams, Defendants-Appellants.**

**Nos. 76–1551, 76–1552.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 12, 1976.

Decided Jan. 28, 1977.

Rehearing Denied March 16, 1977.

George C. Luther, J. Michael McGinley, Weiner, Lippe, Cromley & McGinley, Columbus, Ohio (Court-appointed CJA), for defendants-appellants.

William W. Milligan, U. S. Atty., Thomas D. Thompson, John W. Palmer, Columbus, Ohio, for plaintiff-appellee.

Before CELEBREZZE, PECK and LIVELY, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal of Appellants' convictions after a joint trial by jury for armed robbery of an Ohio bank. We are asked to decide whether the District Court commit-

ted reversible error by permitting the prosecutor, in the presence of the jury, to recite to a recalcitrant Government witness a litany of leading questions which incorporated the entire substance of his unsworn, oral statements inculpating the Appellants. Whether we join with the trial court in viewing this suspect procedure as a mechanism to refresh the witness's present recollection or we adopt the position, advanced by the Government on appeal, that it served the legitimate purpose of impeaching a hostile witness's credibility, our reading of the record compels us to reach the conclusion that the trial court erred in allowing the unsworn statements to be presented to the jury. We therefore reverse and remand the case for a new trial.

Appellants were originally named with three other persons in a one-count indictment charging them with armed robbery of a Westerville, Ohio bank in violation of 18 U.S.C. § 2113(a) and (d). Prior to trial, three defendants disposed of their cases through plea negotiations. Of the three, Stephen Patrick Hall and William John Willison became key Government witnesses against the Appellants. It is the trial testimony of Hall and the circumstances surrounding the prosecutor's elicitation of that testimony which are at issue in this appeal.

Appellants were found guilty by a jury after a two-day trial, which commenced on January 19, 1976, in the United States District Court for the Southern District of Ohio. The date of the trial is significant in light of the amended Federal Rules of Evidence which took effect July 1, 1975.

The Government presented ten witnesses, none of whom could identify Appellants as having actively participated in the bank robbery. The evidence most damaging to the defense was received from William John Willison, one of the five men originally indicted, and Glen Ellis Adkins, an acquaintance of Willison. Willison, the Government's last witness, admitted that he had conceived and planned the crime. He testified that, although he had originally intended to execute the robbery himself, assisted by two friends (other than the Appellants), circumstances conspired to cause him to change his mind. Thereupon he approached Appellant Williams with the intent of recruiting him to implement the scheme. According to Willison, Williams promptly agreed, and Williams, Appellant Shoupe, Stephen Patrick Hall and Terry Gene Seth joined Willison in final criminal preparations, with the understanding that the four would actually carry out the plan. Willison was to receive a share of the proceeds.

Willison further testified that he rented Glen Ellis Adkins' apartment for a single day. The apartment was to be used by Appellants and the others after the robbery for changing their clothes and dividing up the money. Willison identified Williams as having participated with him in the theft of the get-away car. He placed Shoupe, on the eve of the robbery, in possession of two ski masks and two pistols which were to be used in committing the crime. He described, in general terms, the clothing and face masks to be worn by the active participants. He outlined the details of his plan as well as the assignments which Appellants would have upon entering the bank. Finally, he testified to admissions, allegedly made to him by each Appellant, on separate occasions, which tended to confirm their involvement in the crime as well as to belie Shoupe's alibi defense.

Willison's credibility was placed in issue by Appellants' counsel who were able to extract from him several significant admissions, including, inter alia, that he had agreed to testify against Appellants as quid pro quo for a promise by the Government that he would not be prosecuted. He also admitted on direct examination by the prosecutor that he was currently serving a federal prison sentence for another bank robbery.

Glen Ellis Adkins testified for the Government that Willison had asked him if he could rent Adkins' apartment for a 24 hour period for use in "cutting" some illegal drugs. Adkins admitted on cross-examination that he had readily agreed, knowing that his apartment was to be used for crimi-

nal purposes. Adkins testified that he was called upon to vacate the premises on the evening prior to commission of the robbery. When he prematurely returned the next morning (after the robbery), ostensibly to retrieve some personal papers, he found three unknown men in the process of changing their clothes. He identified one as Shoupe. Adkins further testified that, upon returning to his apartment at the end of that day, he discovered a duffle bag in a closet in the dining area. Inside the duffle bag he found "casual" men's clothing, including a ski mask, some paper sacks and a revolver. Adkins admitted that he promptly returned the duffle bag and its contents to Willison's brother. Subsequently, the brother paid Adkins $100.00 for the use of the apartment.

Adkins credibility as a witness was also challenged by the defense. He was confronted with prior grand jury testimony in which he had stated unequivocally that he had no recollection of finding a ski mask included in the contents of the duffle bag and that his agreement with Willison called for him to receive a fee for the use of his apartment which differed from the sum which he mentioned at trial. Finally, he admitted that he had not notified law enforcement officers about his discovery of the suspicious duffle bag until he perceived the immediate possibility that he could be implicated in the robbery. Only then did he come forward to testify against Appellants in return for Government assurances that he would not become "involved."

Our appraisal of the strength of the Government's case, unsupported by the contested, out-of-court statements of Steven Patrick Hall, confirms that the weight of the evidence for conviction was far from overwhelming. Eyewitness accounts by three bank employees and a customer provided only partial descriptions of three armed, masked men who were observed within the bank. We find that the details adduced were insufficient to establish that the clothes and masks worn by the gunmen were those uncovered by Adkins in his apartment or that the pistol also found

there was the pearl-handled weapon which one of the witnesses saw in the belt of a robber.

These crucial items of physical evidence were never produced at trial. Therefore, no witness was able to positively identify them. Their nexus to Appellants and to the commission of the crime itself remained circumstantial throughout the trial, even after Willison testified to their intended use in the robbery plan. Appellants were no more conclusively tied to the bank robbery by the eyewitness identification of the make, model and license number of the get-away car. This testimony only served to partially corroborate Willison's later account of the steps taken by him and Appellants to secure the vehicle for anticipated use in fleeing the crime scene.

The Government's only direct evidence implicating Appellants was Willison's recital of the substance of their admissions to him after the crime was committed and Hall's unsworn, oral statements allegedly made to the FBI. Hall was one of the five men originally indicted for the robbery. Prior to trial, acting through counsel, he entered into a written plea bargain with the Government pursuant to which he pled guilty to two bank robberies, including the one in Westerville, and agreed to testify for the Government against the Appellants and others involved in five unrelated crimes. In return, he was to receive a "satisfactory" sentence and was to be the beneficiary of an "understanding" that other "local matters" pending against him would not be pressed. Hall was sentenced in the District Court to a term of 20 years imprisonment on the Friday prior to the start of Appellants' trial.

The prosecutor extracted from Hall limited testimony concerning his role in the robbery. Hall described the clothes that he had worn, which corroborated to some extent the testimony of an eyewitness, and admitted that Willison had called him with the idea of committing the crime. He also confirmed elements of Adkins' testimony by conceding that an unknown person had walked in on him in the apartment where

he had changed clothes after the robbery and that he had left his clothes and gun there. However, when the prosecutor asked him who had accompanied him into the bank and who was present in the apartment when the proceeds of the crime were distributed Hall steadfastly maintained that he had neither present recollection nor past awareness of these details. He attempted to rationalize this aberration by stating that he had been "shooting a lot of dope at the time [and] was strung up." He also claimed that he was so deeply involved in doing his job during the commission of the crime that he "didn't pay no attention to what else was going on."

At this point, the Government attempted to lay a proper foundation for impeaching Hall's credibility based upon prior inconsistent oral statements allegedly made by him, some two months before the trial, to FBI Agent Richard A. Cleary. The prosecutor, another FBI agent, and Hall's counsel were allegedly present during this interview. The Government claimed that Hall reaffirmed these statements at another meeting within a week of the trial. The statements constituted a detailed account of Appellants' involvement in the robbery.

Defense counsel specifically objected to the Government's intended use of the prior unsworn declarations, and a lengthy colloquy ensued out of the presence of the jury. In response to arguments by both sides, which primarily addressed Sixth Amendment confrontation issues, the trial court acceded to the Government's request that Hall be declared a hostile witness so that leading questions might be used by the prosecutor. It specifically rejected the notion that Hall's prior statements could be used for impeachment purposes. It then ordered that a voir dire be held to determine the reliability of the statements by exploring the circumstances under which they were made.

Only Agent Cleary testified during the voir dire. The following uncontroverted facts were developed which we find to be relevant to this appeal:

1) Hall's alleged out-of-court statements were oral and unsworn;

2) Agent Cleary made contemporaneous, cryptic notes, but no tape recording or verbatim transcript of the interview was prepared;

3) Six days elapsed between the date of the interview and the day that Agent Cleary dictated his memorandum account of Hall's statements based upon his original notes;

4) Hall never was granted the opportunity to read Agent Cleary's memorandum, never signed it nor otherwise attested to the accuracy of its contents.

Our reading of the transcript of the voir dire discloses that the trial court neither read the memorandum, which was never marked for identification, nor inquired of Agent Cleary or the prosecutor whether the original notes from which it was prepared could be made available to the Court. Agent Cleary's testimony did not disclose the complete contents of his memorandum, although it did indicate that Hall had inculpated the Appellants in the commission of the robbery.

At the close of the voir dire the trial court granted the Government permission to use the memorandum for the exclusive purpose of refreshing Hall's present recollection of the facts of the crime and of his prior statements. Both sides objected. Hall was recalled to the stand and continued to profess a lack of memory. When asked again about prior out-of-court statements, he claimed that he did not remember making any, although he did recall the meeting alluded to by the prosecutor. Hall repeated his contention that he did not know the identities of the men who had entered the bank with him. He was asked if he did not recall making a statement to Agent Cleary that the Appellants were, in fact, his accomplices. Defense counsel objected and were granted a continuing exception. Hall answered that he only remembered that the FBI agents had told him the names of the persons involved in planning and executing the crime. The

prosecutor was allowed to repeat the question and Hall restated that he could not recollect making the statement. There then followed a sequence of seventeen additional questions by the prosecutor which incorporated the entire substance of Hall's alleged, out-of-court statements. Hall's response to each question remained essentially the same.

Both sides concede on appeal that the substance of Agent Cleary's memorandum was inadmissible in evidence to prove the truth of the matters asserted therein. Limited reference to it may have been proper, however, for the purpose of either refreshing Hall's present recollection of the details of the bank robbery or of impeaching the credibility of his professed failure to recollect those details, assuming, *arguendo*, that his prior statements were legally inconsistent with his present testimony.

■■■ It is well recognized that the use of leading questions during the direct examination of a witness falls within the sound discretion of the trial court. 3 Wigmore, Evidence § 770 at 157 (1970); This principle is implicitly codified in Rule 611(c) of the Federal Rules of Evidence as well as in Model Code of Evidence Rule 105(g). It is equally well accepted that, once a trial court has exercised its supervisory authority in this area, an appellate court will intervene only if there is a clear abuse of discretion. "Generally, abuse of discretion is not found in the absence of prejudice or clear injustice to the defendant." *United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963).

■■ Case law supports the limited incorporation of a witness's prior sworn statements within leading questions designed to refresh his recollection of their contents. *E. g., United States v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 231–233, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); *Roberson v. United States*, 249 F.2d 737, 742 (5th Cir.), *cert. denied*, 356 U.S. 919, 78 S.Ct. 704, 2 L.Ed.2d 715 (1958). However, we find no precedent sanctioning the recitation in the presence of the jury of extended unsworn remarks, attributed to a Government witness, which were allegedly recorded in an unverified

document and which inculpate the defendant. Courts have condemned this practice as cloaking potentially self-serving accounts of a witness's statements with the dignity and credibility of the prosecutor's office, *United States v. Pucco*, 436 F.2d 761 (2nd Cir. 1971), as increasing the probability that the jury will consider the statements as substantive evidence despite any limiting instruction to the contrary, *Gaines v. United States*, 121 U.S.App.D.C. 213, 349 F.2d 190 (1965), as placing before the jury the content of patently inadmissible past recollection recorded, *Goings v. United States*, 377 F.2d 753, 760 n. 8 (8th Cir. 1967), and as bypassing, to the prejudice of the defendant, reasonable alternative measures to accomplish the same legitimate result. *United States v. Block*, 88 F.2d 618 (2nd Cir.), *cert. denied*, 301 U.S. 690, 57 S.Ct. 793, 81 L.Ed. 1347 (1937).

We note that the scope of the voir dire examination of Agent Cleary was too narrow to permit the trial court to determine whether a legally sufficient foundation had been laid to support the use of the agent's memorandum to refresh Hall's recollection. The four necessary elements of this foundation have been succinctly outlined by the Eighth Circuit in *Goings v. United States, supra*:

> Refreshing a witness's recollection by memorandum or prior testimony is perfectly proper trial procedure and control of the same lies largely in the trial court's discretion . . . Proper foundation requires the witness's recollection to be exhausted, and that the time, place and person to whom the statement was given be identified. When the court is satisfied that the memorandum on its face reflects the witness's statement or one the witness acknowledges, and in his discretion the court is further satisfied that it may be of help in refreshing the person's memory, *the witness should be allowed to refer to the document*. 377 F.2d at 760 (emphasis added).

Prior to the voir dire, the prosecutor properly used leading questions to establish the time, place and person to whom Hall

had allegedly made his prior, unsworn statements. We may infer from the trial court's subsequent declaration of Hall as a hostile witness [1] that it was satisfied that Hall's present recollection was exhausted (having no reason not to credit his own testimony to that effect) and that the substance of Agent Cleary's memorandum would be of some value in attempting to refresh it. We are convinced, however, from a reading of the record that the Court erred in failing to determine whether, on its face, the memorandum was a reliable reflection of the witness's extra-judicial declarations.

Agent Cleary's testimony during the voir dire should have alerted the Court to the possibility that the memorandum lacked sufficient indicia of reliability to justify its blanket disclosure to the jury, even for a limited purpose. Six days elapsed between Agent Cleary's note taking and his dictation of the memorandum. The trial court made no effort to verify the accuracy of Agent Cleary's account by procuring the notes from which it was allegedly derived.[2] Rule 803(8)(B) of the Federal Rules of Evidence reflects Congress' reluctance to implicitly credit the accuracy of documents prepared by law enforcement personnel which purport to recount observations made in furtherance of criminal investigations.[3] We believe that the trial court should have demanded more compelling evidence of reliability before permitting even collateral use. *See Dutton v. Evans*, 400 U.S. 74, 88–89, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970).

We find that the trial court's evidentiary ruling, permitting the refreshment of Hall's recollection by prior, unsworn statements, constituted a clear abuse of discretion.

We adhere to the view of the 8th Circuit that "if a party can offer a previously given statement to substitute for a witness' testimony *under the guise of 'refreshing* recollect', the whole adversary system of trial must be revised." *Goings v. United States*, 377 F.2d at 760 (emphasis added). Whether this conclusion applies with equal force when such an *offering* is made in the "guise" of impeaching a witness based upon his prior inconsistent statements is discussed below.

The Government contends on appeal that its use of Hall's out-of-court statements permissibly served to impeach his credibility as a witness. It claims that the trial court correctly, if inadvertently, allowed such impeachment based upon its tacit finding that Hall's detailed, prior statements, as recorded by Agent Cleary, were inconsistent *with his professed failure of recollection* at trial.

To evaluate the merits of the Government's view, we must decide two issues: first, whether, as a matter of law, prior factual statements may be inconsistent with a present assertion of no memory of having made them; and second, whether the quotation by the prosecutor of such statements in the presence of the jury denied Appellants a fair trial. The first issue is one which has evoked considerable interest, but remains unresolved in the Federal Courts. The Supreme Court, which recognized the problem in *California v. Green*, 399 U.S. 149, 169 n. 18, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), has not yet taken upon itself to resolve the matter, despite the apparent split among the circuits.

■■ The Government relies upon a line of cases commencing with *California v. Green, supra*, and including *U. S. v. Insana*,

---

**1.** A finding of hostility, is technically required to permit the use of leading questions on direct examination, Fed.R.Evid. 611(c), but is no longer a prerequisite to impeachment by a party of its own witness, Fed.R.Evid. 607.

**2.** Recently the 9th Circuit, in *U. S. v. Harris*, 543 F.2d 1247, at 1248 (9th Cir., 1976), condemned as "a usurpation of the judicial function of determining what evidence must be produced in a criminal case", the FBI's longstand-

ing practice of routinely destroying rough interview notes after more formal interview memoranda have been prepared from them. *See also, U. S. v. Harrison*, 173 U.S.App.D.C. 260, 524 F.2d 421 (1975).

**3.** For a comprehensive review of the legislative history of Representative Dennis' amendment to Section (8)(B) *see* 4 Weinstein's Evidence ¶ 803 at 13–24.

423 F.2d 1165 (2nd Cir. 1970), *Nelson v. O'Neil*, 402 U.S. 622, 91 S.Ct. 1723, 29 L.Ed.2d 222 (1971), and our own decisions in *U. S. v. Harris*, 523 F.2d 172 (6th Cir. 1975) and *U. S. v. Mendell*, 538 F.2d 1238 (6th Cir. 1976). Although we do not regard these cases as controlling, they dispose of Appellants' threshold contention that there is an intrinsic constitutional impediment to impeachment of a witness based upon prior inconsistent statements which he claims not to remember. The strictures imposed by rules of evidence upon the admissibility of hearsay are not necessarily coextensive with the limits of the protection afforded criminal defendants by the Sixth Amendment confrontation clause. *California v. Green*, 399 U.S. at 155–156, 90 S.Ct. 1930. Physical availability at trial of the out-of-court declarant, who is not otherwise insulated from cross-examination as in *Douglas v. Alabama*, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), may suffice to satisfy Sixth Amendment constraints. *See California v. Green, supra*, 399 U.S. at 158, 90 S.Ct. 1930. This holds true, whether the prior inconsistent statements are received in evidence under an exception to the hearsay rule, *see e. g., Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *accord*, Fed.R.Evid. 801(d)(1)(A), or they are used solely to impeach credibility. *See e. g., U. S. v. Harris, supra*.

■ Appellants argue that, once Hall had disavowed his alleged confession to Agent Cleary which inculpated them, he became unavailable for cross-examination as surely as if he had properly invoked the Fifth Amendment, citing *Douglas v. Alabama, supra*. No constitutional imperative demands this result. *See Nelson v. O'Neil, supra*. Appellants also suggest that Hall's testimony, which reflected a loss of memory, was not inconsistent with his prior statements, even if it were conceded that they were made. This position is not without precedent. The Second Circuit, speaking in *United States v. Cunningham*, 446 F.2d 194 (2nd Cir. 1971), concluded that:

(W)here the witness gives no testimony injurious to the party calling him, but only fails to render the assistance which was expected by professing to be without knowledge on the subject, there is no reason or basis for impeachment. *Id.* at 196.

The tenor of Hall's initial testimony convinces us, however, that the trial court would have been justified in permitting *limited* impeachment of him, using the substance of Agent Cleary's memorandum, under Rule 613(a) of the Federal Rules of Evidence. We believe that the court could have found, as the Supreme Court did in *California v. Green, supra*, that Hall's alleged lack of memory was so selective as to be incredible. Under such circumstances, it appears to us, as it did to the Second Circuit in *U. S. v. Insana*, 423 F.2d at 1170, that impeachment would have been proper to advance the search for truth.

■ We must now decide whether the prosecutor's actual use of Hall's prior, inconsistent statements went beyond the permissible limits of fairness. In approaching this question we are guided in part by the well-reasoned concurring opinion of Justice Harlan in *Dutton v. Evans*, 400 U.S. at 93–99, 91 S.Ct. 210.

We hold that the recitation by the prosecutor of the entire substance of a witness's disavowed, unsworn prior statements, which, if credited by the jury, would be sufficient to sustain a conviction, abridged defendants' right to a fair trial in violation of the Due Process Clause of the 5th Amendment. *United States v. Morlang*, 531 F.2d 183 (4th Cir. 1975); *United States v. Coppola*, 479 F.2d 1153 (10th Cir. 1973); *United States v. Dobbs*, 448 F.2d 1262 (5th Cir. 1971).

Our holding should not be interpreted as a blanket rejection of impeachment by prior inconsistent statements in situations similar to this. As the Fourth Circuit has stated:

[I]t may be that in certain instances impeachment might somehow enhance the truth-finding process. Yet, whatever validity this latter assertion may have, it must be balanced against the notions of fairness upon which our system is based. Foremost among these concepts is the

principle that man should not be allowed to be convicted on the basis of unsworn testimony.

*United States v. Morlang, supra* at 190, citing *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945).

Appellants' case is readily distinguished from our prior decisions in *United States v. Mendell*, 538 F.2d 1238, and *United States v. Harris*, 523 F.2d 172. In *Harris* the trial court protected the rights of the accused by limiting the scope of impeachment. In *Mendell*, the court below determined in advance, through independent evidence, that the statements were reliable. Here the trial court failed to apply either of these options.

We have reviewed Appellants' other assignments of error and find them to be without merit.

Reversed and remanded.