**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Glen WILLIAMS, Defendant-Appellant.**

**No. 77–5103.**

United States Court of Appeals, Sixth Circuit.

Argued Oct. 6, 1977.

Decided Feb. 22, 1978.

Rehearing and Rehearing En Banc Denied March 31, 1978.

Renee S. Siegan, John W. Tapp, Detroit, Mich., for defendant-appellant.

James K. Robinson, U. S. Atty., William J. Richards, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before EDWARDS, LIVELY and ENGEL, Circuit Judges.

LIVELY, Circuit Judge.

This case involves Rule 803(5) of the Federal Rules of Evidence, which provides as follows:

> The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
>
> \*    \*    \*    \*    \*    \*
>
> **(5) Recorded recollection.** A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable him to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in his memory and to reflect that knowledge correctly. If admitted, the memorandum or record may be read into evidence but may not itself be received as an exhibit unless offered by an adverse party.

Glen Williams was indicted for cashing government checks bearing forged endorsements in violation of 18 U.S.C. § 495. The statute requires that the person charged know that the endorsement is a forgery and that the check be uttered and published as true "willfully, knowingly, and unlawfully with intent to defraud the United States . . . ." There was uncontradicted evidence that the endorsements on four checks introduced as exhibits were forgeries and strong evidence that the defendant had cashed all four of them at a Detroit bar referred to in the indictment. The only substantial issue for the jury, as counsel for the defendant conceded in closing argument, was whether the government had proven beyond a reasonable doubt that Wil-

liams "intentionally cashed these checks knowing that they had forged endorsements."

Gary Ball was called as a witness by the government. Ball operated a junk yard next door to the bar where the four forged checks were cashed and he cashed checks there regularly. During a portion of the time when the forged checks were negotiated at the bar the defendant Glen Williams rented part of Ball's lot and ran a similar business there. Ball testified that when the first of the forged checks was returned by the bank the proprietor of the bar presented it to him, assuming that he had cashed it. After Ball had denied cashing the check he told the proprietor to check it out further. Ball testified, ". . . later, he told me it was Glenn * Williams that had cashed it." The witness then related his conversations with Williams about this check. After stating that Williams admitted that he had cashed the check and was willing to make it good, Ball was asked if Williams had stated where he had gotten the check. The witness answered, "Not to my knowledge, I don't remember him telling me where he got it." When the government attorney asked Ball specifically if he ever had a conversation with Williams "about a deal he had going with his landlord about checks . . .," counsel for the defendant objected. The court directed that the question be rephrased, and this question and answer followed:

Q  Mr. Ball, I am going to rephrase my question slightly.
Did you have a conversation with Mr. Williams about another check besides this one payable to Mr. Quick?

A  We had a conversation—I don't remember exactly the time or the day or when—but I asked him about the checks, and he said that he had cashed them for a landlord or a care-taker. One check, he said he had found in a hotel room.

The witness was then asked to examine a written statement which he had given to a secret service agent 15 months prior to the trial.[1] He identified the signature at the end of the statement as his and made an incomplete reference to a "discrepancy" as he read the statement to himself. Once Ball finished reading the statement, he was asked, "Can you now remember more about these conversations than you just did a moment ago?" Ball answered, "No." The jury was then excused and a "special record" was made. The direct examination of the witness by government counsel included the following:

Q  Mr. Ball, the statement that you have in front of you now, did you give that statement to Agent Lutz of the Secret Service in about July of '75?

A  I did.

Q  Were the conversations that you had had with Mr. Williams fairly fresh in your mind at the time you made that statement?

A  They were.

Q  Did you swear to Agent Lutz that that statement was a true statement?

A  I did.

Q  You were put under oath, asked to raise your hand and so forth, to tell the truth?

A  I don't remember if I was or not.

Q  Had you told Agent Lutz before basically the same version about these conversations with Williams orally but not in writing?

A  Do you mean from the first time I talked to Mr. Lutz or up until this was taken?

Q  On previous occasions when you had talked to Mr. Lutz, did you tell him basically the same version that you put in the statement there?

A  When I first met Mr. Lutz, he was accusing me of cashing the checks. And he accused me before I even talked to Tony about this check, the Willington check, or the Quick check. It was after that they told me that I wasn't the one that they were looking

---

\* Throughout the transcript the defendant's given name is written "Glenn," rather than "Glen."

1.  The statement, as subsequently read to the jury, is included as an appendix to this opinion.

for that Tony asked me if I could get his money back for the check, and I told him I would try, I would talk to Glenn about it.

Q But my question is: Did you give basically the same account to Agent Lutz orally on previous occasions before you gave this statement?

A Basically the same account, to the best of my recollection.

Q Was that statement true and accurate to the best of your knowledge?

A Yes.

Q And is that statement true and accurate now to the best of your knowledge?

A It is.

On cross-examination, still out of the presence of the jury, Ball testified that the statement was in the handwriting of Secret Service Agent Lutz and that it had not been taken down word for word by the agent. Rather, "We talked and then he wrote this out, and then I signed it." While affirming his previous testimony that the statement was true and accurate at the time he gave it, Ball now said it was true and accurate "in general." On the question of what Williams had told him about where he (Williams) had gotten the checks, the testimony was as follows:

Q All right. On this paper, here (indicating), it says, "Glenn told me that he and his/or a landlord or caretaker were getting checks before the payee could get his mail."

Is that a quote from you?

A I think the quote from me would have probably been that something like wherever Glenn stayed at, he got it from his caretaker or landlord. I don't remember ever putting in there that "before coming from the mail, getting the mail".

Q Did Glenn ever tell you—excuse me— did Mr. Williams ever tell you that these checks were stolen checks?

A No, he didn't.

Q Okay. Did you intimate, did you try to lead Officer Lutz, Agent Lutz, into believing that you believed that

Glenn Williams was admitting to you a crime?

A No, I didn't.

Q So, what were you telling Agent Lutz that you knew?

A That he cashed the checks at Tony's bar, and that he had got them from where he was living at to cash them, to the best of my knowledge.

\* \* \* \* \* \*

Q Did you tell Mr.—excuse me—Agent Lutz that it was your understanding that someone else was stealing checks and giving them to Glenn?

A I didn't put it in those words. I told him it was my understanding that the checks were coming from an apartment building.

Q Did you tell him that they were stolen checks, that Mr. Williams had told you that?

A No, I didn't.

Q Is there anything else in this statement that is not what you told Officer Lutz but, rather, is what he wrote in here?

A No, there is not; not that I know of.

Q Would you just explain to me, Mr. Ball, did you give Officer Lutz— Agent Lutz the impression that Mr. Williams had told you that he was stealing checks?

A No, I didn't.

Q Did you give Agent Lutz the impression, or did you try to give him the impression, that you believed that Mr. Williams was cashing stolen checks and that he knew it?

A No, I didn't.

Q Did you believe, when you were signing this statement, that you were in any way incriminating Mr. Williams?

A No, I didn't.

On redirect examination Ball admitted reading the statement before he signed it, and swearing to Agent Lutz that it was true. He contended that he had not told the agent that Williams had told him that he or the landlord or caretaker were getting

the checks before the addressees picked up their mail. He also gave an explanation for his comment to Williams, "I thought you told me you had stopped this b. s.," which did not imply that the checks were stolen. He testified that he and Williams remained friends.

The district court then heard arguments of counsel after which it ruled that the statement would be admitted as "recollection of a statement that had been adopted by the witness." The District Judge held that a foundation had been adequately laid for admission of the statement, finding that his (Ball's) "relationship with the defendant here, his demeanor, his selective memory with regard to matters, convinces this Court that he is withholding and that his protestations of failure of recollection are not convincing to the Court." Following the requirements of Rule 803(5), the court did not admit the statement as an exhibit, but permitted it to be read to the jury after deleting the subjective impression, "It was my understanding that someone else was stealing the checks and giving them to Glenn." When the jury returned, and before the statement was read, Ball testified again that the statement was true and accurate at the time he gave it. Ball then read the statement.

On cross-examination, after the jury had heard the statement, Ball testified that the writing and words of the statement were those of Agent Lutz. He stated that he was frightened when the agent first accused him of passing bad checks and that he wanted to cooperate. He testified that Agent Lutz told him that he, Lutz, suspected that the landlord was involved. He didn't remember telling Lutz that Williams told him that he or his landlord was getting the checks before the payees could get their mail.

Agent Lutz testified that the statement was taken from Ball after several discussions, and at the time of the statement there was no suggestion that Ball was under suspicion or was being accused. He said the statement was taken at the Secret Service Office following a review of their prior discussions and that the witness read the statement, asserted that it was correct and said he was satisfied it was accurate when asked if he had any corrections, deletions or additions to make. Lutz testified that Ball then signed and swore to the statement.

Following denial of motions for a mistrial and for a judgment of acquittal the case was submitted to the jury and Williams was found guilty on four counts of the indictment. The only issue on appeal relates to admission of the statement signed by Gary Ball as substantive evidence. We affirm.

■ The first contention of Williams is that the statement should not have been admitted because it was not Ball's statement. This position is based on the fact that Agent Lutz wrote the statement in his own words. This argument misconstrues the requirements of Rule 803(5). To be admissible the memorandum or record must have been made "*or adopted by the witness* when the matter was fresh in his mind and to reflect that knowledge correctly." (emphasis added). By signing and swearing to the statement Gary Ball adopted it. This occurred approximately six months after the events recited in the statement. Ball testified unequivocally that his conversations with Williams were fresh in his mind at the time he signed the statement and that it was a true and accurate statement at that time.

As proposed by the Supreme Court, Rule 803(5) provided only for reading into evidence a memorandum or record shown to have been made by the witness. The House of Representatives amended the rule to add "or adopted by the witness." The amendment was explained in the Senate Report to P.L. 93–595, Rules of Evidence, as follows: "When the verifying witness has not prepared the report, but merely examined it and found it to be accurate, he has adopted the report, and it is therefore admissible." S.Rep. No. 93–1277, 93rd Cong., 2d Sess., 4 U.S.Code Cong. & Admin.News at p. 7074 (1974). Williams relies on this court's decision in *United States v. Shoupe*, 548 F.2d 636 (6th Cir. 1977), where we held it was a

violation of due process to permit a prosecuting attorney to present the entire substance of an unsworn, oral statement, later disavowed by the witness, in attempting to impeach his in-court testimony. *Shoupe* does not control the present case. In *Shoupe* the witness testified he did not even remember making the statement, whereas Gary Ball testified that he read and signed the statement. There was clearly no adoption by the witness in *Shoupe* of the memorandum of his earlier unsworn, oral statement and the court properly did not consider Rule 803(5).

■ Appellant's second argument is that it was error to admit a statement "when the witness had clear recollection of his conversations with defendant and when he testified that a statement written by a government investigator following a conversation with the witness was inaccurate." If the record supported the quoted assertion the Ball statement would not be admissible under Rule 803(5). Rule 803(5) applies only to memoranda or records of matters "about which a witness once had knowledge but now has insufficient recollection to enable him to testify *fully and accurately* . . ." (emphasis added). There is no doubt that Ball had sufficient recollection to testify generally about his conversations with Williams. However, the critical question about those conversations was whether Williams had told him how the checks came into his possession. This was the very aspect of the conversations which Ball testified he could not recall. Referring to one of the checks which Williams had cashed at the bar, Ball testified, ". . . I don't remember him telling me where he got it." He further testified that Williams said that the checks came from his caretaker or landlord and that he didn't remember stating that they were taken before payees could get their mail. In addition he testified that he didn't remember saying, "I told Glenn he was nuts."

The District Judge, who observed Gary Ball testify before the jury and in the special record proceedings, concluded that the witness was exercising a "selective memo-ry." Regardless of whether it was a deliberate act born of his friendship with the defendant, it is clear that Ball was claiming no recollection of certain features of his conversations with Williams which had been included in the statement that he had previously adopted. Once it was established that Ball's in-court testimony would be incomplete because of his insufficient recollection, the statement which he had adopted when the events were fresh in his mind, and which he repeatedly testified was accurate, became admissible under Rule 803(5). We note that in a case tried before the effective date of the Federal Rules of Evidence, the reviewing court applied the "modern concept of the admissibility of relevant evidence" to approve the admission of an earlier statement which a witness had given F.B.I. agents where the evidence of insufficient recollection was quite similar to that in the present case. *United States v. Senak,* 527 F.2d 129, 138 (7th Cir. 1975), *cert. denied,* 425 U.S. 907, 96 S.Ct. 1500, 47 L.Ed.2d 758 (1976). This result is clearly correct under the rules.

■ Williams makes much of the fact that Ball disputed portions of the statement on cross-examination. However Ball continued to agree that the statement was accurate "in general." He appeared to question primarily any implication to be drawn from the statement that he considered Williams guilty of a crime, yet his disagreements with the language of the statement were couched in terms of insufficient recollection. We conclude that the matters brought out in cross-examination did not preclude admissibility of the statement, but went only to the weight to be given it. *United States v. Senak, supra,* 527 F.2d at 139. The jury was free to believe Ball's explanation of his intentions and impressions when he adopted the statement. They were not bound to accept the statement as conclusive evidence of the defendant's guilt. However, they were entitled to hear the statement as an accurate account of Ball's conversations with Williams, given at a time when those conversations were recent events and his memory of them was

unimpaired. As Judge Learned Hand wrote in *Di Carlo v. United States,* 6 F.2d 364, 368 (2d Cir. 1925):

> The possibility that the jury may accept as the truth the earlier statements in preference to those made upon the stand is indeed real, but we find no difficulty in it. If, from all that the jury sees of the witness, they conclude that what he says now is not the truth, but what he said before, they are none the less deciding from what they see and hear of that person and in court.

■ In seeking to promote the "growth and development of the law of evidence to the end that the truth may be ascertained and proceedings justly determined," Rule 102, the framers of the Federal Rules of Evidence sought to limit the exclusionary effect of the hearsay rule. As Judge John Minor Wisdom pointed out in *Dallas County v. Commercial Union Assurance Co.,* 286 F.2d 388, 391, n. 1 (5th Cir. 1961), "The [hearsay] rule is not an ancient principle of English law recognized at Runnymede. And, gone is its odor of sanctity." It is a rule which was an outgrowth of the adversary system. Many exceptions have been recognized as experience has demonstrated that literal application of the hearsay rule would often exclude that evidence which is most relevant to the questions at issue. The touchstone for admission of evidence as an exception to the hearsay rule has been the existence of circumstances which attest to its trustworthiness. Rule 803 of the Federal Rules of Evidence brings together a number of long-recognized exceptions and provides for the admissibility of enumerated types of hearsay evidence regardless of the availability of the declarant. Courts and commentators have long recognized the "recorded past recollection" exception which is the subject of Rule 803(5). The Advisory Committee's Note to Exception (5) makes it clear that the method of establishing the initial knowledge of the declarant and the accuracy of the material sought to be introduced must be determined from the circumstances of each case. 28 U.S.C. (1970) App.Supp. V at pp. 2351–52. We find no abuse of discretion in the determination of the District Judge that the statement signed by Gary Ball should be read to the jury. It contained the indicia of trustworthiness required by Rule 803(5) and was never categorically disowned or contradicted by the witness. There being no claim that the Sixth Amendment right to confrontation was violated, see *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), no reversible error has been demonstrated.

The government contends that the statement in this case was admissible also as non-hearsay evidence under Rule 801(d)(1)(A). Such a holding would require a determination that the statement was inconsistent with Ball's testimony at trial and that it was given at an "other proceeding." The district court did not reach either of these questions and neither do we, leaving them for a proper case where their resolution is necessary for a decision.

The judgment of the district court is affirmed.

### APPENDIX

"My name is Gary Daniel Ball. I live at 2325 Manson, Detroit, Michigan. This statement concerns my knowledge of Glenn Williams and the negotiations of checks by him. I've known Glenn Williams for at least two years. During that time I operated the B & D Auto Wrecking, 6530 West Jefferson, Detroit, Michigan. For about two months I rented space there to Glenn Williams who was also trying to operate a junk yard business. My yard was located next door to Margaret's Bar which is owned by Tony Poczik. While working the business I would cash checks at Margaret's Bar. Toward the end of January 1975 after returning from Florida I stopped at Margaret's Bar and Tony told me he had received a check from his bank that was a forgery. He said he had accepted the check from Glenn Williams. Tony asked me to help him get his money back. Glenn later stopped at the yard and I talked with him about the check. Glenn told me that he and his/or a landlord or caretaker were getting

checks before the payee could get his mail. I told Glenn he was nuts. Sergeant Lutz has shown a number of Government check photostats where the original check was cashed at Margaret's Bar. One of those checks was payable to Willington F. Quick for $101.00 dated 8–3–74 addressed to Keego Harbor, Michigan. After Special Agent Lutz first talked with me about that check, I saw Doug Williams, the son of Glenn Williams, and asked him to have his dad stop by and see me. A few days later Glenn Williams stopped at my house. I showed him the check photostat Special Agent Lutz had left at my house. I talked with him about the check. He said in effect"—"I said in effect," instead of, "He said"—"I said in effect 'I thought you told me you had stopped this b. s.' He told me he had found the check in a dresser drawer of a hotel room where he had rented a room. He said he would make the check good and said he would later give me the $101.00 to pay Tony. I told him I didn't want to be involved, that he should go and pay Tony himself."