831 F.2d 297
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Michael BAILEY (85-4048), Richard Ferguson Flynn (85-4055,
87-3225), Defendants-Appellants.
 Nos. 85-4048, 85-4055 and 87-3225
 United States Court of Appeals, Sixth Circuit.
 October 6, 1987.
 
 Before LIVELY, Chief Circuit Judge, MILBURN and RYAN, Circuit Judges.
 MILBURN, Circuit Judge.
 
 
 1
 Defendants Michael Bailey and Richard Ferguson Flynn appeal their convictions arising from a conspiracy to transport stolen stained and beveled glass in interstate commerce in violation of 18 U.S.C. Secs. 2314, 371 and 2. For the reasons that follow, we affirm in part and reverse in part.
 
 I.
 
 2
 In June 1985, defendants Flynn and Bailey, together with coconspirator Tyrone Mitchell, were indicted on three counts of causing the interstate transportation of stolen glass in violation of 18 U.S.C. Secs. 2314 and 2. They were also indicted on one count of conspiring to transport stolen glass in interstate commerce in violation of 18 U.S.C. Sec. 371. Tyrone Mitchell pled guilty to the conspiracy count prior to trial. James Harrell was an unindicted coconspirator whose cooperation led to the indictment of the defendants.
 
 
 3
 The enterprise forming the basis for the indictment involved a series of transactions in which Harrell and Mitchell stole panes of stained and beveled glass from residences and business establishments in and around Cincinnati, Ohio. Through Bailey, they arranged for the sale and delivery of the glass to defendant Flynn.
 
 
 4
 Harrell began delivering glass to Flynn in 1983. Harrell told Flynn that the glass was 'hot,' and Flynn paid him only in cash. Flynn 'educated' Harrell with regard to the proper manner of removing and transporting glass. In this connection, Flynn told Harrell to prepare a fake receipt for each shipment of glass in case he should be stopped by the police en route to Flynn's home in Huntington, West Virginia. On one occasion, when Harrell was stopped by police during the course of transporting a load of stolen glass, Flynn appeared on the scene and informed the authorities that the glass was his.
 
 
 5
 In November 1983, Harrell stole glass from two residences in the Cincinnati area and sold it to Flynn at his home in West Virginia. Again, in June 1984, Harrell sold Flynn glass that he had stolen from a residence in Cincinnati.
 
 
 6
 On or about December 12, 1984, Harrell removed five panels of glass from a residence located at 830 Academy Avenue in Cincinnati. Through Bailey, Harrell arranged a delivery to Flynn.
 
 
 7
 In January 1985, Mitchell and Bailey 'checked out' two residences in Covington, Kentucky, for purposes of evaluating whether they were potential burglary sites. On January 15 and 16, 1985, Mitchell and Harrell burglarized these homes. Once again, Harrell arranged for delivery of the glass to Flynn through Bailey.
 
 
 8
 In early 1985, Flynn informed Harrell that he would be interested in purchasing glass from the Cincinnati Club, which had been closed for renovation. On February 5, 1985, Harrell broke into the Cincinnati Club and determined that it would be possible to remove the windows. Two days later, Mitchell and Harrell returned to the Cincinnati Club and removed the glass. Again, Harrell arranged delivery to Flynn through Bailey. Harrell testified that he and Mitchell each received $500 for the glass worth between $20,000 and $30,000.
 
 
 9
 During the night of February 20, 1985, Harrell broke into the offices of Ohio Labor Council Eight and stole three large panes of glass, religious in nature, valued at $11,000. The same night, Harrell and Mitchell stole door panels from the Itkoff residence in Cincinnati.
 
 
 10
 Early on the morning of February 22, 1985, Mitchell and Harrell returned to the union hall to steal some of the glass left after the first break-in. Harrell was arrested by Cincinnati police, and he subsequently agreed to assist them in their efforts to apprehend his coconspirators.
 
 
 11
 Thereafter, Harrell participated in a series of monitored telephone calls with Bailey, Flynn, and Mitchell. On February 22, 1985, Harrell and Flynn discussed a possible sale of the union hall glass. At that time, Flynn made a statement indicating that he had sold the glass stolen from the Cincinnati Club.
 
 
 12
 On February 25, 1985, Harrell again spoke with Flynn regarding the union hall glass. Flynn agreed to come to Cincinnati and look at the glass that day or the following day.
 
 
 13
 On the same date, Harrell also spoke with Mitchell regarding the union hall glass. They discussed a price, and complained that Flynn was not paying a high enough price for their services. Later that day, Harrell had a similar conversation with Michael Bailey.
 
 
 14
 Between Harrell's February 22, 1985, apprehension and March 4, 1985, the glass stolen from the union hall and the Itkoff residence was held by the government in storage. On March 4, 1985, FBI agents in Cincinnati and Huntington, West Virginia, prepared an affidavit to support a request for a search warrant for Flynn's garage. The affidavit was based largely upon information from Harrell and corroborated by the monitored telephone calls. The affidavit contained general information regarding the ongoing criminal activity and specific information concerning thefts from the union hall, the Itkoff residence, and the Cincinnati Club.
 
 
 15
 On March 4, 1985, Harrell and Cincinnati Police Officer Harry Frisby, posing as Harrell's brother-in-law, delivered the union hall and Itkoff glass to Flynn in West Virginia. Flynn purchased the load for $200. Immediately thereafter, FBI agents executed the search warrant. They found thirteen pieces of stolen glass, all of which had been purchased from Harrell. They also found a receipt bearing the name 'Michael Bailey.' Although the Cincinnati Club glass was not recovered, it appeared in the hall outside the courtroom at Flynn's direction on the last day of the trial.
 
 
 16
 Beginning on October 8, 1985, defendants Bailey and Flynn were tried in a joint bench trial. After six days of testimony, the district court found both defendants guilty of all counts in the indictment. Bailey was sentenced to consecutive terms of two years on Count I and one year on each remaining count. Flynn was sentenced to consecutive terms of five years on Count I, two years on Count II, three years on Count III, and four years on Count IV.
 
 
 17
 On November 6, 1986, defendant Flynn filed a motion for a new trial. The basis for this motion was the recantation of trial testimony by Harrell and Mitchell and the discovery of documents pertaining to the rental of the U-Haul truck used in the burglary of the Cincinnati Club. A hearing on the motion was held on January 23, 1987. On February 27, 1987, the motion for a new trial was denied.
 
 
 18
 In this consolidated appeal, the defendants present numerous issues for review. They will be discussed seriatim.
 
 II.
 A. Bailey's Motion for a Severance
 
 19
 Defendant Bailey argues that the district court committed reversible error in refusing to grant his motion for a severance because 'the evidence adduced against the defendant Flynn was so massive and cumulative that it flowed over the defendant Bailey like a river overflowing its banks.' We disagree.
 
 
 20
 The district court's refusal to sever the trials of codefendants will be reversed only for abuse of discretion. See, e.g., United States v. Lawson, 780 F.2d 535, 545 (6th Cir. 1985) (per curiam). This court has consistently recognized a preference for joint trials of individuals who are indicated together, United States v. Stull, 743 F.2d 439, 446 (6th Cir. 1984), cert. denied, 470 U.S. 1062 (1985), and 'a showing of compelling prejudice' must be made before an appellate court will find that denial of a severance motion constitutes abuse of discretion, United States v. Warner, 690 F.2d 545, 552 (6th Cir. 1982); see also United States v. Swift, 809 F.2d 320, 322 (6th Cir. 1987).
 
 
 21
 Our reading of the transcript of this bench trial reveals that the judge was sensitive to the need for separate consideration of the evidence against each defendant. Under these circumstances, we are unwilling to conclude that Bailey suffered 'compelling prejudice' as the result of the district court's refusal to sever the trials. See Warner, 690 F.2d at 553 (trier of fact presumed capable of considering evidence only against defendant against whom it is offered). Accordingly, we find no abuse of discretion.
 
 B. The Motion to Dismiss Count IV
 
 22
 In Count IV of the indictment, defendants were charged with causing the interstate transportation of the glass stolen from the union hall. They argue that the district court erred in refusing to dismiss Count IV, because our decision in United States v. Monasterski, 567 F.2d 677 (6th Cir. 1977), dictates the conclusion that the property lost its character as stolen before it was transported in interstate commerce.
 
 
 23
 In Monasterski, three youths agreed to steal tires from a railroad boxcar. In the process, they were arrested by Conrail police. After the FBI became involved in the incident, the youths agreed to effectuate delivery of the tires so that law enforcement officials might apprehend their 'fence.' The tires were delivered to one James Logan, who in turn delivered them to the defendant Monasterski.
 
 
 24
 Logan and Monasterski were arrested for their roles in the enterprise. Logan pled guilty to possession of stolen goods, and Monasterski went to trial. He was convicted of violating 18 U.S.C. Sec. 659, which proscribed receipt or possession of stolen goods with knowledge that they are stolen.
 
 
 25
 On appeal, Monasterski argued that his conviction could not be upheld because the goods had lost their character as stolen by the time he received them. This court agreed.
 
 
 26
 [T]he portion of 18 U.S.C. Sec. 659 under which Appellant was convicted requires the Government to prove beyond a reasonable doubt that the defendant received stolen goods. Just as did the judges of nineteenth century England, we do not believe the words 'stolen goods' include goods that were stolen but recovered by their owner or his agent. All would agree that at some point in time the goods in this case ceased being stolen goods. We must decide at what point the goods lost that status in contemplation of the law. We feel the best and only workable rule is the common law rule--viz, the goods lost their stolen character immediately upon being recovered by the owner or his agent. Trying to choose some later point in time to support the conviction in this case would necessitate a strained reading of the words involved and would yield unnecessary uncertainty.
 
 
 27
 Id. at 681 (footnote omitted, emphasis in original).
 
 
 28
 The court recognized that application of the rule could result in a benefit to criminals and could hamper law enforcement.
 
 
 29
 We are very sympathetic to the Government's desire to apprehend fences. Their social disutility is notorious. We cannot agree with the Government's . . . arguments [because they] ignore the relevant statutory requisite of stolen goods. We fully realize that the beneficiaries of the rule espoused here likely have the precise culpable state of mind required for conviction of receiving stolen goods. Our law does not punish bad purpose standing alone, however; instead we require that mens rea accompany the actus reus specifically proscribed by statute. It is one of the most fundamental postulates of our criminal justice system that conviction can result only from a violation of clearly defined standards of conduct. We must apply this principle evenhandedly and not be swayed by our attitudes about the moral culpability of a particular defendant.
 
 
 30
 Id. at 683.
 
 
 31
 Although we have carefully considered the arguments advanced by the government, we can find no principled basis upon which to distinguish Monasterski from the facts of the present case. The focus of the Monasterski analysis is upon the character of the goods at the time the defendant performs the act for which he is charged. In Monasterski, the tires were recovered by law enforcement officers, and the assistance of the thieves was obtained before the defendant received the goods. This exercise of dominion by law enforcement officers was sufficient to cause the goods to lose their character as stolen.[1]
 
 
 32
 In the present case, FBI officials confiscated the glass stolen from the union hall and held it in storage for approximately ten days before they arranged, with Harrell's assistance, the delivery to Flynn. We know of no case in which this degree of governmental control has been considered something less than recovery of goods sufficient to change their stolen character. Cf. United States v. Johnson, 767 F.2d 1259, 1269 (8th Cir. 1985) (temporary diversion of stolen automobile for purposes of identification and inspection was mere surveillance and not recovery; goods did not lose stolen character); United States v. Henneberry, 719 F.2d 941, 947-48 (8th Cir. 1983) (mere observation did not cause goods to lose stolen character), cert. denied, 465 U.S. 1107 (1984); United States v. Muzii, 676 F.2d 919, 923-24 (2d Cir.), cert. denied, 459 U.S. 863 (1982) (property did not lose its character as stolen when it was dropped overnight at a trucking terminal used by undercover officers investigating property thefts); United States v. Dove, 629 F.2d 325, 329 (4th Cir. 1980) (automobile lost its character as stolen when it was purchased with government money and was placed on lot operated by informant for thirty days before being sold to defendant). Accordingly, defendants' convictions on Count IV are REVERSED.
 
 
 33
 C. Admission of the Taped Conversations between Harrell and Other Members of the Conspiracy
 
 
 34
 At the trial, the government introduced taped conversations in which Harrell spoke with Flynn and Bailey in an attempt to set up delivery of the union hall glass. Bailey's counsel did not object to the admission of these taped statements. Bailey argues that the tapes were improperly admitted because the conversations took place after Harrell was arrested and, therefore, after the conspiracy ended. Moreover, Bailey argues that the tapes were not admissible under Federal Rule of Evidence 801, the coconspirator's exception, because the government failed to present independent evidence of the existence of the conspiracy before the tapes were played to the district court as trier of fact.
 
 
 35
 The law is clear that, in the absence of plain error, a party may not challenge the introduction of evidence unless a timely objection is made in the trial court. Fed. R. Evid. 103(a)(1); see Helminski v. Ayerst Laboratories, 766 F.2d 208, 211 (6th Cir.), cert. denied, 106 S. Ct. 386 (1985). Because no objection was made to this evidence at trial, this court may exercise its discretionary power to review only if 'the failure to do so would result in a manifest miscarriage of justice.' United States v. Martin, 757 F.2d 770, 771 (6th Cir.) (per curiam), cert. denied, 472 U.S. 1029 (1985). See United States v. Young, 105 S. Ct. 1038, 1046-47 (1985); United States v. Mendez-Ortiz, 810 F.2d 76, 78 (6th Cir. 1986), cert. denied, 107 S. Ct. 1384 (1987); United States v. Hook, 781 F.2d 1166, 1172 (6th Cir.), cert. denied, 107 S. Ct. 269 (1986). Reversal is required only if the error was so plain that the trial court and the prosecutor were derelict in countenancing it. Mendez-Ortiz, 810 F.2d at 78.
 
 
 36
 Before the government can take advantage of the coconspirator exception to the hearsay rule provided in Rule 801, the government "must show by a preponderance of the evidence (1) that a conspiracy existed, (2) that the defendant against whom the hearsay is offered was a member of the conspiracy, and (3) that the hearsay statement was made in the course and in furtherance of the conspiracy." United States v. Hamilton, 689 F.2d 1262, 1268 (6th Cir. 1982) (quoting United States v. Vinson, 606 F.2d 149, 152 (6th Cir. 1979), cert. denied, 444 U.S. 1074 (1980)), cert. denied, 459 U.S. 1117 (1983). As the government points out, Vinson made it clear that the hearsay statements themselves may be considered in determining whether the threshold showing required to admit evidence under the coconspirator's exception has been satisfied. Accordingly, Bailey's argument that reversible error was committed because the existence of the conspiracy was not established by independent evidence is without merit. See Bourjaily v. United States, 107 S. Ct. 2775, 2782 (1987).
 
 
 37
 Bailey also argues that the taped conversations were inadmissible because they were made after Harrell was arrested, and were beyond the duration of the conspiracy. We disagree. "[W]here a conspiracy contemplates a continuity of purpose and a continued performance of acts, it is presumed to exist until there has been an affirmative showing that it has terminated; and its members continue to be conspirators until there has been an affirmative showing that they have withdrawn." Hamilton, 689 F.2d at 1268 (quoting United States v. Mayes, 512 F.2d 637, 642-43 (6th Cir.), cert. denied, 422 U.S. 1008 (1975)).
 
 
 38
 The recorded conversations in the present case, like those recorded in Hamilton, indicated that the conspirators contemplated the continuation of 'business as usual.' The burden of establishing withdrawal from the conspiracy is a heavy one, and it has not been satisfied in this case. We therefore hold that no error was committed by the district court in admitting the recorded conversations.
 
 
 39
 D. Use of Prior Statements for Impeachment and Refreshment of Recollection
 
 
 40
 Defendant Bailey argues that the district court erred by allowing the government to use a prior statement made by Mitchell and adopted under oath to impeach him. He further argues that the district court erred by permitting the government to use a prior statement made by Harrell concerning Bailey's involvement in the conspiracy to refresh Harrell's recollection. Bailey argues that this evidence was impermissibly used to create a false memory in the witnesses and to place otherwise inadmissible evidence before the trier of fact.
 
 
 41
 On direct examination of Mitchell, the government asked whether Michael Bailey had received money from the sale of glass stolen from homes in Newport and Covington, Kentucky. Mitchell responded that Bailey did not, to his knowledge, receive money from this transaction. At that point, the prosecutor asked Mitchell whether he made a statement during the course of the hearing on his guilty plea indicating that Bailey had, in fact, received money from the shipment. Bailey's counsel objected to the government's impeachment of its own witness. In this bench trial, the court overruled the objection, noting that 'it's important to get to the truth. Either he misspoke himself at the time he pled guilty or he is misspeaking himself now, and we have got to get to the bottom of it.' Joint Appendix at 319.
 
 
 42
 Rule 607, Federal Rules of Evidence, provides that '[t]he credibility of a witness may be attacked by any party, including the party calling the witness.' There is no requirement that the witness be declared hostile before impeachment will be permitted. United States v. Shoupe, 548 F.2d 636, 642 n.1 (6th Cir. 1977). 'Clearly, the Government can impeach its own witness, . . . and evidence of a prior inconsistent statement of the witness may be admitted for that purpose even though the statement tends directly to inculpate the defendant.' United States v. Miller, 664 F.2d 94, 97 (5th Cir. Unit B 1981) (per curiam), cert. denied, 459 U.S. 854 (1982).
 
 
 43
 We have no argument with the general proposition that the government may not call a witness for the primary purpose of placing otherwise inadmissible evidence before the jury in the guise of impeachment. Miller, 664 F.2d at 97. The government may, however, impeach its own witness if it calls the witness in good faith anticipation that he will give useful testimony. United States v. Webster, 734 F.2d 1191, 1192-93 (7th Cir. 1984). In the present case, Mitchell's testimony was highly valuable to the government, and there is no support for the contention that he was called merely for purposes of placing otherwise inadmissible evidence before the trier of fact.
 
 
 44
 Moreover, we conclude that defendant's reliance on Shoupe, 548 F.2d at 636, is misplaced. In Shoupe, this court held 'that the recitation by the prosecutor of the entire substance of a witness's disavowed, unsworn prior statements, which, if credited by the jury, would be sufficient to sustain a conviction, abridged defendants' right to a fair trial . . ..' Id. at 643.
 
 
 45
 However, we recognized that use of prior statements to impeach may in some cases serve to "enhance the truthfinding process." Id. (quoting United States v. Morlang, 531 F.2d 183, 190 (4th Cir. 1975)). Accordingly, we declined to adopt a blanket rule rejecting use of prior inconsistent statements to impeach government witnesses in a criminal trial.
 
 
 46
 In the present case, the use of the prior statement was much more limited than in Shoupe. Moreover, Mitchell adopted his prior statement under oath. Thus, the overriding concern in Shoupe, conviction on the basis of an unsworn, disavowed statement, is not present in this case. Finally, the district court allowed use of the statement as part of a concerted effort to find the truth.[2] Under these circumstances, we find no abuse of discretion.
 
 
 47
 Bailey also objects to the government's use of Harrell's statement made during the FBI investigation to refresh his recollection. The government asked Harrell who had accompanied him on various occasions to 'check out' homes that were potential burglary targets. When Harrell could not recall, the court allowed the government to refresh his recollection through use of the prior statement. Objections were made on the grounds that there had not been an adequate showing that Harrell's memory was exhausted, Joint Appendix at 169, and that Harrell did not prepare the statement. Joint Appendix at 201.
 
 
 48
 A district court's decision to allow the government to refresh the recollection of a witness is subject to review only for abuse of discretion. United States v. Pickett, 746 F.2d 1129, 1136 (6th Cir. 1984), cert. denied, 469 U.S. 1226 (1985). In the present case, there was no such abuse.
 
 
 49
 First, there was an adequate showing that Harrell's memory was exhausted. He explicitly stated that he could not remember who accompanied him on the occasions in question. He stated that he remembered reading and adopting the statement made in the course of the FBI's investigation. After reading the statement, he indicated that his memory had been refreshed. Under these circumstances, the government established a proper foundation, and no abuse of discretion occurred. Cf. Shoupe, 548 F.2d at 642 (abuse of discretion to allow memory to be 'refreshed' when witness could not recall making prior statement, its accuracy was questionable, and witness had never adopted it).
 
 
 50
 Second, the fact that the statement was written by an FBI agent does not preclude its use to refresh recollection. Shoupe expressly recognized the appropriateness of the use of a statement made or acknowledged by the witness. Bailey's argument in this regard is without merit. See United States v. Boyd, 606 F.2d 792, 794 (8th Cir. 1979) (no abuse of discretion in allowing witness to refresh recollection by reference to report summarizing his statements to FBI).
 
 E. Use of Evidence of Prior Bad Acts
 
 51
 At the bench trial, the district court allowed the admission of evidence tending to show that Flynn and Bailey had previously participated in other criminal activity involving stained and beveled glass. Specifically, the court heard evidence that Bailey had been convicted of receiving stolen glass and that Flynn had participated in the theft of stained and beveled glass in Philadelphia five years prior to the trial. The district court admitted this evidence, over the objection of defense counsel, under Rule 404(b), Federal Rules of Evidence.
 
 
 52
 Under Rule 404(b), evidence of prior crimes, wrongs or acts is not admissible to show that a defendant acted in conformity therewith. However, such evidence is admissible to show intent, knowledge, absence of mistake, motive, plan or opportunity. The list of permissible uses contained in Rule 404(b) is not exhaustive. See United States v. Mendez-Ortiz, 810 F.2d at 79. Rather, such evidence may be used for any purpose other than the creation of an inference that the defendant acted in conformity with the prior act. Id. The trial court is afforded wide discretion when considering the admissibility of evidence under Rule 404(b), and its decision will be reversed only upon showing an abuse of discretion. United States v. Robinson, 713 F.2d 110, 111 (5th Cir. 1983), cert. denied, 465 U.S. 1008 (1984), United States v. Espinoza, 578 F.2d 224, 228 (9th Cir.) (per curiam), cert. denied, 439 U.S. 849 (1978).
 
 
 53
 In the present case, the government argues that the use of prior bad acts evidence was permissible to show knowledge. In order to establish a violation of 18 U.S.C. Sec. 2314, the government must prove beyond a reasonable doubt that the defendant knew the goods were stolen.
 
 
 54
 This court has consistently upheld the use of prior bad acts as evidence that a criminal had knowledge that the goods he possessed were stolen. See, e.g., United States v. Tarnowski, 583 F.2d 903, 906 (6th Cir. 1978), cert. denied, 440 U.S. 918 (1979); United States v. Reese, 568 F.2d 1246, 1250 (6th Cir. 1977); United States v. Semak, 536 F.2d 1142, 1144-45 (6th Cir. 1976). The fact that defendant Bailey did not directly place his intent 'in issue' does not render the evidence in the present case inadmissible against him.
 
 
 55
 'Faced with a plea of not guilty, the prosecution is under no obligation to wait and see whether the defendant argues the non-existence of an element of crime before the prosecution presents evidence establishing that element.' . . . Indeed, the government has an affirmative burden to prove every element of the crime beyond a reasonable doubt.
 
 
 56
 United States v. Hamilton, 684 F.2d 380, 384 (6th Cir.) (quoting United States v. Buchanan, 633 F.2d 423, 426 (5th Cir. 1980), cert. denied, 451 U.S. 912 (1981)), cert. denied, 459 U.S. 976 (1982); see also United States v. Townsend, 796 F.2d 158, 161-62 (6th Cir. 1986). Accordingly, we conclude that the district court did not commit error by admitting this evidence of prior bad acts.
 
 
 57
 F. Deferral of Ruling on Motion for Judgment of Acquittal
 
 
 58
 At the close of the government's case, defendant Bailey made a motion for a judgment of acquittal on all counts of the indictment. The district court deferred ruling on the motion. On appeal Bailey makes two related arguments. He argues that the evidence was insufficient to support his conviction and that the district court committed reversible error by deferring ruling on the motion for judgment of acquittal.
 
 
 59
 The motion for judgment of acquittal at the close of the government's case implements 'the requirement that the prosecution must establish a prima facie case by its own evidence before the defendant may be put to his defense.' The rule provides that the court 'shall order the entry of judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses.' Accordingly its requirements are mandatory. . . . The court must decide a motion made at the close of the government's case at that time and may not reserve decision.
 
 
 60
 2 C. Wright, Federal Practice and Procedure Sec. 462, at 640 (1982) (quoting United States v. Hinderman, 625 F.2d 994, 996 (10th Cir. 1980) (per curiam), and Fed. R. Crim. P. 29(a)). The courts considering this issue have uniformly held that a trial court must rule on a motion for judgment of acquittal made at the close of the government's case, and that it is error to reserve ruling. See, e.g., United States v. Neary, 733 F.2d 210, 218 (2d Cir. 1984); United States v. Conway, 632 F.2d 641, 643 (5th Cir. Unit B 1980); United States v. Rhodes, 631 F.2d 43, 44 (5th Cir. Unit B 1980); United States v. House, 551 F.2d 756, 758 (8th Cir.), cert. denied, 434 U.S. 850 (1977); United States v. Braverman, 522 F.2d 218, 222 (7th Cir.), cert. denied, 423 U.S. 985 (1975); United States v. Wininger, 427 F.2d 1128 (6th Cir. 1970) (per curiam).
 
 
 61
 While the courts have uniformly recognized that it is error to reserve ruling on a Rule 29(a) motion, they have also recognized that the error is harmless if, at the close of the government's case-in-chief, viewing the evidence in the light most favorable to the government, the evidence is sufficient to permit submission of the case to the jury. Conway, 632 F.2d at 643; Rhodes, 631 F.2d at 45; Howse, 551 F.2d at 758; Braverman, 522 F.2d at 223. We conclude that the error in the present case was harmless. Viewed in the light most favorable to the government, the evidence at the trial established that Bailey regularly served as the communications link between other members of the conspiracy. There is also evidence indicating that he assisted in 'checking out' potential burglary targets and that he accompanied other members of the conspiracy on delivery trips. Because there was sufficient evidence to support Bailey's conviction at the time the motion was made, deferral of ruling on the motion was harmless. Our holding in this regard necessitates the conclusion that defendant Bailey's challenge to the sufficiency of the evidence must fail. See Glasser v. United States, 315 U.S. 60, 80 (1942).
 
 
 62
 G. The Denial of Bailey's Motion for Specific Findings
 
 
 63
 After the district court entered its finding of the defendants' guilt, defendant Bailey made a motion for specific findings pursuant to Rule 23(c), Federal Rules of Criminal Procedure. The district court denied the motion, and Bailey argues that this denial constitutes reversible error.
 
 
 64
 Rule 23(c) was amended in 1977 to clarify the requirement that a motion for special findings must be made before the general finding is announced by the trial court. Because Bailey's motion was untimely, the district court did not err in denying it.
 
 H. Duplicity in the Indictment
 
 65
 Despite the fact that he can find no authority to support his position and that he did not raise it in the district court, Flynn argues that the three substantive counts in the indictment are duplicitous. This argument is summarily rejected. "[E]ach interstate or foreign transportation of stolen [goods] constitutes a separate violation of Sec. 2314, even if the various acts of transportation are part of a single scheme." United States v. Martin, 800 F.2d 560, 562 (6th Cir. 1986) (quoting United States v. Chitty, 760 F.2d 425, 428 (2d Cir.), cert. denied, 106 S. Ct. 310 (1985)).
 
 I. The Search Warrant
 
 66
 Both defendants argue that the fruits of the search of Flynn's garage should have been suppressed because the affidavit presented to the issuing magistrate contained omissions of information material to the probable cause determination. The affidavit, signed by FBI Agent David Dufour, contained general information regarding the ongoing nature of the criminal enterprise and specific information regarding the theft of glass from the Cincinnati Club, the union hall, and the Itkoff residence in Cincinnati.
 
 
 67
 Initially, we conclude that defendant Bailey has no standing to challenge the search of Flynn's garage. The critical inquiry for purposes of this analysis is whether Bailey had a reasonable expectation of privacy in the premises. See, e.g., Rawlings v Kentucky, 448 U.S. 98, 104-05 (1980). Bailey has presented no facts sufficient to show that he possessed a reasonable expectation of privacy in Flynn's garage, and thus he has no standing to challenge the constitutionality of the search. See Brown v. United States, 411 U.S. 223, 229 (1973) (defendant who sold stolen property to coconspirator had no standing to challenge validity of warrant used to search coconspirator's store).
 
 
 68
 With regard to defendant Flynn, our analysis must focus on whether, under the totality of the circumstances, the information in the affidavit presented 'a fair probability that contraband or evidence of a crime' would be found in Flynn's garage. Illinois v. Gates, 462 U.S. 213, 238 (1983). "[O]nly the probability, and not a prima facie showing, of criminal activity is the standard of probable cause." Id. at 235 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)); see also United States v. Pelham, 801 F.2d 875, 877 (6th Cir. 1986), cert. denied, 107 S. Ct. 1305 (1987).
 
 
 69
 The existence of probable cause does not turn on elaborate technicalities. Magistrates should utilize a 'commonsense, practical' approach in determining whether probable cause exists to search a particular place, and the magistrate's determination is entitled to substantial deference. Gates, 462 U.S. at 230, 236.
 
 
 70
 In the present case, the affidavit presented to the issuing magistrate recited that defendant Flynn had been previously arrested for burglary and receipt of stolen stained glass. The affiant stated the facts surrounding the theft of glass from the union hall, the Cincinnati Club, and the Itkoff residence. The affiant further stated that valuable stained glass had been stolen on at least five other occasions in the Cincinnati area during the past two months.
 
 
 71
 The affiant then recited the information received from Harrell. He stated that Harrell, Bailey, and Mitchell had stolen glass on 150 occasions since 1979 and had sold almost all the glass to Richard Flynn. The affiant repeated Harrell's explanation of the manner in which these transactions took place, including the fact that the glass was usually delivered to Flynn's garage and occasionally delivered to Flynn's warehouse in Huntington.
 
 
 72
 The affidavit contained a summary of the telephone conversations between Flynn and Harrell in which Flynn expressed an interest in purchasing the glass recovered after Harrell's arrest. It described the plan to complete delivery of that glass on the afternoon of March 4, 1985. Finally, the affiant repeated Harrell's statement that the 'turnaround time' for the glass is substantial, that Flynn stored stolen glass in his garage on a regular basis, and that all the glass in Flynn's garage was stolen.
 
 
 73
 We conclude that the affidavit, on its face, was sufficient to establish 'a fair probability that contraband or evidence of a crime' would be found in Flynn's garage. Gates, 462 U.S. at 238. Although Flynn argues that the information in the affidavit was stale, we disagree. The information indicated that Flynn's garage served as a clearinghouse for stolen glass on a regular, continuous basis. This sort of information has consistently been held sufficient to support a finding of probable cause. See, e.g., United States v. Word, 806 F.2d 658, 662 (6th Cir. 1986) (information in warrant indicating that records of ongoing criminal drug sales would be found in defendant's office sufficient to support probable cause determination), cert. denied, 107 S. Ct. 1383 (1987); United States v. Tucker, 638 F.2d 1292, 1299 (5th Cir. Unit A 1981) (probable cause to believe that gambling paraphernalia would be found on defendant's premises existed six weeks after last game had been seen; 'a primary consideration in evaluating the staleness issue is whether the affidavit describes a single transaction or a continuing pattern of criminal conduct.'), cert. denied, 454 U.S. 833 (1981).
 
 
 74
 We also reject defendant's argument that, because the union hall glass lost its character as stolen under our Monasterski decision, the magistrate's reliance on the information regarding this transaction was improper. We disagree. The information regarding this transaction supported the government's theory that Flynn was involved in an ongoing conspiracy to transport stolen glass. We recognized in Monasterski that the government may charge a conspiracy even when the stolen goods have lost their stolen character. Under these circumstances, reliance on the information regarding the union hall glass was not improper.
 
 
 75
 We likewise conclude that the district court committed no error in refusing to suppress the fruits of the search because the warrant was overbroad. '[W]here the probable cause showing is that the place to be searched is a virtual warehouse of items stolen from many places, a description in terms of the general types of articles sought will suffice.' 2 W. LaFave, Search and Seizure Sec. 4.6(c), at 244 (2d ed. 1987); see United States v. Blum, 753 F.2d 999, 1001 (11th Cir. 1985).
 
 
 76
 Finally, defendant Flynn argues that the evidence seized under the warrant should have been suppressed because the affidavit omitted information detracting from the probable cause determination. He argues that because the affidavit omitted information indicating that the Cincinnati Club glass was no longer in his possession and that Harrell had actually been paid greater amounts for the stolen glass than indicated in the affidavit, the probable cause determination was invalid.
 
 
 77
 In Franks v. Delaware, 438 U.S. 154 (1978), the Supreme Court recognized that, when information in an affidavit supporting a search warrant is given by an affiant who knows it is false or who gives it with reckless disregard of its truth or falsity, and that information is material to the probable cause determination, the warrant is void and the evidence must be suppressed. Id. at 155-56. The holding in Franks has been extended to situations in which material omissions affect the probable cause determination. See United States v. Stanert, 762 F.2d 775, 780 (9th Cir.), modified, 769 F.2d 1410 (9th Cir. 1985); United States v. Williams, 737 F.2d 594, 604 (7th Cir. 1984), cert. denied, 470 U.S. 1003 (1985); United States v. Dennis, 625 F.2d 782, 791 (8th Cir. 1980); United States v. Davis, 617 F.2d 677, 693-95 (D.C. Cir. 1979), cert. denied, 445 U.S. 967 (1980); United States v. Martin, 615 F.2d 318, 329 (5th Cir. 1980); United States v. Melvin, 596 F.2d 492, 498-99 (1st Cir.), cert. denied, 444 U.S. 837 (1979); see generally 2 W. LaFave, Search and Seizure Sec. 4.4(b), at 194-96 (2d ed. 1987).
 
 
 78
 On this record, we conclude that the omissions were not material to the determination of probable cause. Although the FBI possessed information indicating that Flynn might have disposed of the Cincinnati Club glass, this fact was by no means certain. Moreover, the remaining information in the affidavit indicated that he was continuing to use his garage as a clearinghouse for stolen glass.
 
 
 79
 The information regarding the possible discrepancy in the amount Harrell was paid in the course of these transactions is also insignificant. Whether Mitchell and Harrell were paid $1000 or $3,200 for the Cincinnati Club glass, it is clear that either amount represents an inordinately low price for glass having a minimum value of $20,000. Thus, this discrepancy does not destroy the inference that Flynn was paying a low price for glass that he knew was stolen.[3]
 
 
 80
 Finally, Flynn argues that the value discrepancy casts doubt on Harrell's credibility, thus diminishing the value of the other statements made by Harrell and contained in the affidavit. Again, we disagree. Much of the information provided by Harrell was corroborated by the tape recorded phone calls indicating that Flynn was still in the business of purchasing stolen glass.
 
 
 81
 Viewing the 'totality of the circumstances' surrounding the issuance of the search warrant, we cannot conclude that the omitted material would have altered the magistrate's conclusion that there was a fair probability that evidence or contraband would be found in Flynn's garage. Accordingly, the motion to suppress was properly denied.
 
 J. Flynn's Motion for a New Trial
 
 82
 On November 6, 1986, defendant Flynn filed a motion for a new trial based on newly discovered evidence pursuant to Rule 33, Federal Rules of Criminal Procedure. He alleged that this newly discovered evidence, consisting of recantations by Mitchell and Harrell and documents relating to rental of the U-Haul truck used in the Cincinnati Club theft, indicates that he was unjustly convicted.
 
 
 83
 The first item of evidence relied upon by the government is Harrell's recantation. In a handwritten affidavit, Harrell stated that he lied at trial regarding Flynn's participation in the Cincinnati Club heist. Specifically, he stated in the affidavit that Flynn was not involved before the windows were stolen and that he, Mitchell, and Bailey attempted to sell the glass to Moe Evans before they sold it to Flynn. This testimony was consistent with that given by Evans at the trial.
 
 
 84
 As the government points out, there are some suspicious circumstances surrounding the execution of this affidavit. On July 15, 1986, Harrell called FBI Agent Jeffrey Lang and told him that in June 1986, Charles Bishop, a 'business associate' of Flynn's, met with him at Michael Bailey's home. The two drove to a park, where Bishop asked Harrell to sign a handwritten affidavit previously shown to Harrell by Attorney Arthur Church. Harrell refused to sign it.
 
 
 85
 Bishop told Harrell that if he would sign the affidavit exculpating Flynn he would be given $5,000 plus another $5,000 for legal fees he would incur in connection with a possible perjury charge. He told Harrell that several other people, including Moe Evans, Evans' wife, Bailey, and Mitchell had exculpated Flynn. He further stated that if Harrell refused to sign the affidavit his signature would be forged. Harrell told Lang he did not sign the affidavit. Bishop filed an affidavit denying that he pressured Harrell to change his testimony.
 
 
 86
 On December 18, 1986, Harrell called Timothy Smith 'from parts unknown.' In this conversation, he repudiated his statement to Lang and stated that everything written in the affidavit was true. He denied that Bishop told him his signature would be forged if he refused to sign. He said that he recanted the statements in his affidavit when he spoke with Agent Lang because he was incarcerated at the time and would tell Lang anything in order to get out of jail. Harrell could not be found to testify at the hearing on the motion for a new trial.
 
 
 87
 On December 3, 1986, Tyrone Mitchell signed an affidavit exculpating Flynn. He stated that Flynn was not involved in the theft of the union hall or Cincinnati Club glass.
 
 
 88
 The remaining evidence submitted by defendant to support his motion consists of several documents relating to Tyrone Mitchell's U-Haul rental. During the trial, defendant Flynn argued that he was not involved in the theft of the Cincinnati Club glass. He supported this argument by alleging that Harrell and Mitchell attempted to sell the glass to Moe Evans in Columbus. Defendant argued that the fact that the glass was offered to Evans supported his theory that the glass was not stolen pursuant to his instruction. Evans testified that the glass had been offered to him.
 
 
 89
 At the trial, the only evidence regarding the rental of the U-Haul used in the Cincinnati Club heist was a contract signed by Tyrone Mitchell showing the beginning mileage on the truck used in the union hall burglaries. However, at some point in time it became apparent that the truck used in connection with the Cincinnati Club burglaries was rented in the name of Randy Halbert. Flynn attached this contract to his motion for a new trial. This contract, which shows that the truck traveled 636 miles while in Halbert's possession, allegedly supports Flynn's theory that Harrell and Mitchell offered the glass to Evans before they offered it to him.
 
 
 90
 Flynn also alleges that this 'Halbert contract' was Brady material withheld by the government. The government denies that it ever had possession or knowledge of the document.
 
 
 91
 A U-Haul employee, Donna Jenkins, said in an affidavit that she showed the Halbert contract to FBI Agent McTighe, who said that it could not be the correct contract because the mileage was too high. The government responds that, even if McTighe made such a statement, it was justified because during the early stages of the investigation the FBI had no information regarding the possibility that the glass had been offered to someone else.
 
 
 92
 McTighe filed an affidavit attached to the government's response to the motion for a new trial. He stated that he never saw the Halbert contract, that it was never in his possession, and that he did not withhold information from the defense. He stated that he first heard the name 'Randy Halbert' during the trial, and that he called Donna Jenkins during the trial to ask her to search for the contract. In one of his many affidavits, Harrell stated that he told the FBI about the rental in the name of Halbert before the trial. According to McTighe, Jenkins could not find the contract.
 
 
 93
 Flynn argues that the government's version of events could not be true because Jenkins was not working for U-Haul while the trial was going on. The trial began on October 8, 1985; Donna Jenkins' last day of work at U-Haul was October 5, 1985.
 
 
 94
 Duane Rosenlieb, Jr., a private investigator who worked for Flynn's attorney, filed an affidavit in which he stated that a U-Haul employee told him the FBI had taken the Halbert contract. Steve Doan, the U-Haul manager, told Rosenlieb that the employee was mistaken, and that the FBI had only taken the Mitchell contract, a copy of which had been provided to defense counsel. It is unclear where the Halbert contract actually came from, and how defense counsel procured it before filing its motion.
 
 
 95
 The district court denied Flynn's motion in an order dated February 27, 1987. Because it concluded that the government did not withhold the Halbert contract from the defendants, a finding that is supported on this record, it rejected Flynn's argument that the 'newly discovered evidence' must be evaluated under the standards set forth in United States v. Bagley, 473 U.S. 667 (1985). Instead, the court concluded that the motion must be analyzed under the standards set forth by this court in United States v. O'Dell, 805 F.2d 637 (6th Cir.), cert. denied, 106 S. Ct. 1658 (1986), and United States v. Allen, 748 F.2d 334 (6th Cir. 1984) (per curiam).
 
 
 96
 After evaluating the evidence, the district court concluded that, under either the Bagley or O'Dell standard, Flynn would not be entitled to a new trial. Accordingly, the motion was denied.
 
 
 97
 In ruling on the motion, the district court reviewed the evidence under the Bagley and O'Dell standards. When evaluating motions for a new trial based on the recantation of a government witness, a third, slightly different test is used.
 
 
 98
 A new trial should be granted [on the basis of recanted testimony] where the court is reasonably well satisfied that the testimony given by a material witness is false; that, without it, the jury might have reached a different conclusion; that the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.
 
 
 99
 Gordon v. United States, 178 F.2d 896, 900 (6th Cir. 1949), cert. denied, 339 U.S. 935 (1950). This rule is based on the Seventh Circuit's decision in Larrison v. United States, 24 F.2d 82, 87-88 (7th Cir. 1928), and has been adopted by most federal courts. 3 C. Wright, Federal Practice and Procedure Sec. 557.1, at 343, 344 n.14 (1982). The failure to apply the Larrison test is harmless in view of the fact that it is no less stringent than the Bagley rule considered by the district court.
 
 
 100
 The decision to deny a motion for a new trial is within the discretion of the district court, and will not be reversed absent clear abuse of discretion. O'Dell, 805 F.2d at 640. An appellate court should not upset the findings underlying the trial court's denial of a motion for a new trial unless there is no evidence to support them. United States v. Johnson, 327 U.S. 106, 111-12 (1946); Government of the Virgin Islands v. Lima, 774 F.2d 1245, 1251 (3d Cir. 1985); see also United States v. Adi, 759 F.2d 404, 408-09 (5th Cir. 1985). Such findings are entitled to particular deference when the judge ruling on the new trial motion is the same judge who presided at a bench trial. Lima, 774 F.2d at 1251. Under such circumstances, the trial judge is 'in a unique position to know whether [the new evidence] would have affected the outcome.' Id.
 
 
 101
 Motions for a new trial based on recanted testimony are granted only '[o]n very rare occasions.' 3 C. Wright, supra, Sec. 557.1, at 346-47. Recantations are viewed with extreme suspicion.
 
 
 102
 This judicial skepticism seems entirely appropriate. Perhaps occasionally a perjurious witness feels remorse for having led to the conviction of an innocent man, but these cases must surely be rare. On the other hand, the possibility that one who stands convicted of a crime will use coercion or bribery to persuade a witness to recant is very real.
 
 
 103
 Id. at 351. This skepticism is clearly borne out by appellate decisions reviewing the denial of new trial motions based upon recantations. See, e.g., United States v. Ramsey, 761 F.2d 603, 604 (10th Cir. 1985), cert. denied, 106 S. Ct. 851 (1986); Adi, 759 F.2d at 408-09; United States v. Carmichael, 726 F.2d 158, 160 (4th Cir. 1984); United States v. Kearney, 682 F.2d 214, 220 (D.C. Cir. 1982).
 
 
 104
 In the present case, the district court carefully reviewed the evidence presented by defendant Flynn in support of his motion for a new trial. It concluded that Harrell's testimony at trial was corroborated in many respects by other evidence, that much of the material provided in the recanting affidavit was cumulative, and that the new evidence would not have affected the outcome at trial. On the basis of this record, and in light of the district court's unique opportunity to evaluate the effect of the recantation and the peculiar circumstances surrounding Harrell's recantation, we conclude there has been no abuse of discretion.
 
 
 105
 This case is riddled with recantations and reassertions. On the cold record it is entirely impossible for this court to determine which story is the true version. The district court judge, who took the evidence and personally observed the witness as he testified, was in a much better position, than this court to determine whether, even after noting [the witness'] frequent about faces, his testimony was nonetheless sufficiently credible to support a jury verdict. The district court's determination that there was no valid recantation but merely another flip-flop by the witness adequately justifies a finding that there was no newly discovered evidence justifying a new trial. While such a precarious and vascillating witness is an unstable stand on which to base a conviction, we cannot say that the record justifies overturning the trial court's decision on petition for a new trial.
 
 
 106
 Ramsey, 761 F.2d at 604. The judgment of the district court denying Flynn's motion for a new trial is therefore affirmed.
 
 III.
 
 107
 The judgment of the district court is REVERSED as to the defendants' convictions under Count IV of the indictment. In all other respects, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 The goods lose their character as stolen because they are recovered by the owner or his agent. Law enforcement officials are uniformly considered to be agents of the owner for purposes of this analysis. United States v. Dove, 629 F.2d 325, 327 (4th Cir. 1980); Monasterski, 567 F.2d at 684 & n.16
 
 
 [2]
 Bailey's counsel, in effect; recognized this. After sorting through the confusion regarding Mitchell's inconsistent statement, the district court remarked that 'it's to [Bailey's] advantage to get to the bottom of this rather than to go the other way. My job is to seek the truth.' Joint Appendix at 328. Mr. Boyd agreed, replying, 'I agree Your Honor. I think we have found it.'
 
 
 [3]
 In any event, it is unclear that Mitchell and Harrell were discussing the Cincinnati Club burglary when the number '32' was mentioned in the tape recorded conversation of February 25, 1985. This factor casts doubt on the argument that the statement that Mitchell and Harrell each received $500 for their role in the theft was made with knowledge that it was false or with reckless disregard of its truth or falsity. With respect to the Cincinnati Club glass, Agent Lang testified that, based on his knowledge and experience with stolen property cases, he believed that the Cincinnati Club glass would still be in Flynn's possession. Transcript Vol. 2, p. 95-96. This is further evidence of a lack of bad faith