**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

KENNETH WAYNE THOMPSON, III,

    Petitioner - Appellant,

v.

JOE M. ALLBAUGH,

    Respondent - Appellee.

No. 17-6127
(D.C. No. 5:15-CV-01078-W)
(W.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **MORITZ**, and **EID**, Circuit Judges.
_____

    An Oklahoma jury found Kenneth Thompson guilty of second degree murder for the death of John Ingersoll. Mr. Thompson appealed his conviction to the Oklahoma Court of Criminal Appeals (OCCA), which affirmed. Mr. Thompson then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Western District of Oklahoma. The district court denied relief. We granted Mr. Thompson a certificate of appealability (COA) on two claims: (1) whether there was constitutionally sufficient evidence to sustain Mr. Thompson's conviction and

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule Appellate Procedure 32.1 and 10th Circuit Rule 32.1.

(2) whether the admission of certain evidence violated Mr. Thompson's Due Process Clause or Confrontation Clause rights.

We conclude the OCCA did not unreasonably apply federal law in concluding the evidence was sufficient to sustain Mr. Thompson's conviction. Mr. Thompson has also failed to prove a violation of the Due Process Clause, or that the OCCA based its Confrontation Clause decision on an unreasonable determination of fact. Accordingly, we affirm the district court's denial of habeas relief.

## I. BACKGROUND

On March 21, 2009, Mr. Ingersoll, Eric Thrower and Dontae Newton went to Fritzi's, a club located on 10th Avenue and MacArthur Boulevard in Oklahoma City. Fritzi's refused admission to Mr. Thrower and Mr. Newton because they were underage, but Mr. Ingersoll entered the club. Around 2:00 a.m., Mr. Thrower and Mr. Newton returned in a Buick automobile to pick up Mr. Ingersoll. When they arrived at Fritzi's, the parking lot was crowded; at least 100 people were outside. Mr. Thrower and Mr. Newton found Mr. Ingersoll in the parking lot and he got into the Buick. Mr. Thrower was driving, Mr. Ingersoll was in the front passenger seat, and Mr. Newton was in the back. While the Buick was still in the parking lot, random gunshots rang out, causing people, including Kendall Richardson and Mr. Thompson, to jump in their cars and leave.

Earlier that night, Mr. Richardson and Mr. Thompson had gone to Club D's with Aleisha Banton, Destiny Dotson, and another friend. They left Club D's in separate cars and drove to Fritzi's. After the gunshots in the Fritzi's parking lot, Ms. Dotson observed Mr. Thompson enter the driver's seat of his white two-door car, while Mr. Richardson

2

got into the passenger seat. At trial, Ms. Dotson testified that the white car she saw Mr. Thompson in at Fritzi's looked similar to the white Camaro in the State's Trial Exhibit 5.

Due to the gunshots, security officers from Fritzi's directed everyone out of the parking lot through a single exit, forcing them to turn north on MacArthur Boulevard. As Mr. Thrower was exiting Fritzi's parking lot, the Buick almost collided with a white car. Mr. Ingersoll reacted by hanging out the window of the Buick and throwing gang signs at the white car.

After turning onto MacArthur Boulevard, Mr. Thrower witnessed the same white car driving behind him, slowing down and speeding up repeatedly. The Buick was in the far right lane and the white car was in the next lane to the left. The white car sped up to get close to Mr. Thrower's Buick, at which point the passenger in the white car fired at least one shot into the Buick. The bullet hit Mr. Ingersoll in the neck and killed him. After firing, the shooter yelled about "G" something.[1]

Donald Fitzpatrick was in the parking lot of the OK Corral, around 23rd Avenue and MacArthur Boulevard, when he heard a gunshot. He looked up, and within a few seconds he saw Mr. Thrower drive the Buick very quickly into the parking lot from the far right lane. He also witnessed a white Camaro or Firebird a little bit behind Mr. Thrower's car in the lane to the left speed past Mr. Thrower. That night, police recovered a single shell casing on MacArthur Boulevard.

---

[1] There was testimony that Mr. Thompson was a member of the "Gang Tight" clique. App. at 725–26.

During the investigation, police received an anonymous tip that Equan England might have been involved in the shooting. The police obtained a warrant to search Mr. England's car and found a shell casing in the back seat. Later testing revealed that the shell casing in Mr. England's car had been fired from the same gun as the shell casing found on MacArthur Boulevard.

After further police investigation, including Detective William Lord's interview of Ms. Banton, the State charged Mr. Thompson and Mr. Richardson with the first degree murder of Mr. Ingersoll. The state trial court severed the cases and Mr. Richardson, the alleged shooter, was tried first and acquitted.

At Mr. Thompson's trial, the State called Ms. Banton and asked her about her interview with Detective Lord. During direct examination she denied making most of the statements contained in Detective Lord's interview notes. Importantly, she denied telling Detective Lord she saw Mr. Thompson and Mr. Richardson get into a white Camaro and leave Fritzi's the night of the murder, and she further denied telling Detective Lord that Mr. Richardson had come to her apartment later that night and confessed to having just shot someone in the head. Ms. Banton claimed Detective Lord threatened her before and during the interview, and that her statements were coerced. On cross-examination Ms. Banton testified she made up the statements she reported to Detective Lord (1) because Mr. Thompson impregnated her friend and she was angry at how he was treating the friend and (2) to protect another friend, Mr. England, who was a potential suspect in the murder.

After Ms. Banton's testimony, the State called Detective Lord. He testified that Ms. Banton stated during her interview that Mr. Richardson came to her apartment a few hours after the shooting, appeared nervous, and confessed that Mr. Richardson had just shot someone in the head and did not know if the guy was dead or alive. To refute Ms. Banton's description of the interview as coercive, the State asked to play a portion of the video of Detective Lord's interview of Ms. Banton. The trial court allowed the State to play the video and specifically instructed the jury that the video was not to be considered for the truth of the matter asserted.

At the conclusion of Mr. Thompson's trial, the court again instructed the jury that impeachment evidence could be considered only for credibility purposes. The trial court further instructed the jury on the lesser included offense of second degree murder, and the jury found Mr. Thompson guilty of that lesser included charge.

Mr. Thompson appealed his conviction to the OCCA on seven separate grounds. The OCCA denied relief on each of Mr. Thompson's claims.[2] Mr. Thompson then

---

[2] The seven issues considered by the OCCA were:

(1) whether the trial court erred by refusing to grant his demurrer to the first degree murder charge at the close of the State's evidence; (2) whether the evidence was sufficient to support his conviction for second degree murder; (3) whether he was denied a fair trial as a result of the trial court's error in permitting the State to present unconfronted admissions by his co-defendant through a third party under the guise of impeachment evidence; (4) whether the trial court erred in refusing to grant a mistrial or by allowing the State's witness Eric Thrower's continued testimony after it was established that [Mr.] Thrower had used marijuana during the trial and allegedly had been influenced by the victim's father to change his testimony regarding whether he could identify Mr. Thompson; (5) whether the jury was properly instructed on aiding and abetting; (6) whether he

5

brought a habeas petition in the Western District of Oklahoma, realleging all but the first

ground for relief. The district court referred the matter to a magistrate judge, who issued a

report and recommendation suggesting that the court deny Mr. Thompson's habeas

petition in its entirety. The district court adopted the report and recommendation in full

and denied Mr. Thompson a COA.

Mr. Thompson next filed a request for a COA from this court, which we granted in

part and denied in part. Specifically, we granted a COA on two issues:

> (1) Whether the evidence presented at [Mr. Thompson's] trial was
> constitutionally sufficient to support his conviction (Ground One of his
> petition); and (2) whether the admission of witness Banton's recanted
> statements, including in particular a purported confession from
> [Mr.] Richardson, rendered [Mr.] Thompson's trial fundamentally unfair
> and/or violated his rights under the Confrontation Clause (Ground Two of
> his petition).

Exercising jurisdiction pursuant to 28 U.S.C. §§ 1291, 2253(c), we affirm the district

court's order denying Mr. Thompson habeas relief.

## II.   ANALYSIS

### A.  *General Standard of Review Under § 2254*

Mr. Thompson's claims are governed by 28 U.S.C. § 2254. If a state court decided

a claim on the merits, a federal court cannot grant a writ of habeas corpus unless the

applicant can show that the state court's adjudication of the claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the
> Supreme Court of the United States; or

---

received ineffective assistance of counsel; and (7) whether cumulative error
deprived him of a fair trial.

6

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* § 2254(d).

A state court decision is contrary to clearly established federal law (1) "if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases" or (2) "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). A state court's decision is an unreasonable application of federal law if it is "objectively unreasonable." *Id.* at 409. A state court's decision is not unreasonable merely because it is incorrect. *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Nor is it unreasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* (alteration in original) (quoting *Yarborough*, 541 U.S. at 644).

"[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the [state] court's . . . determination.'" *Id.* (second and fourth alterations in original) (quoting *Williams*, 529 U.S. at 341–42). "[A]n imperfect or even

7

an incorrect determination of the facts isn't enough for purposes of § 2254(d)(2)." *Grant v. Trammell*, 727 F.3d 1006, 1024 (10th Cir. 2013).

If the state court reached the merits of a claim, "[w]e review the district court's legal analysis of the state court decision de novo." *Littlejohn v. Trammell*, 704 F.3d 817, 825 (10th Cir. 2013) (quotation marks omitted). If the state court did not reach the merits of a claim, we must "review the district court's legal conclusions de novo and factual findings for clear error." *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir. 2004).

## B. *Sufficiency of the Evidence*

### 1. Standard of Review

"Sufficiency of the evidence on a habeas petition is a mixed question of law and fact. We ask whether the facts are correct and whether the law was properly applied to the facts, which is why we apply both 28 U.S.C. § 2254(d)(1) and (d)(2) . . . ." *Brown v. Sirmons*, 515 F.3d 1072, 1089 (10th Cir. 2008) (citation omitted) (internal quotation marks omitted). Sufficiency of evidence claims on habeas review receive a "twice-deferential standard" of review. *Parker v. Matthews*, 567 U.S. 37, 43 (2012). First, "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). Second, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge . . . [unless] the state court decision was 'objectively unreasonable.'" *Id.* (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)).

## 2. Analysis

The ultimate inquiry for a reviewing court considering a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This requires "a reviewing court 'faced with a record of historical facts that supports conflicting inferences [to] presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *McDaniel v. Brown*, 558 U.S. 120, 133 (2010) (quoting *Jackson*, 443 U.S. at 326). Additionally, "[t]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16.

In Oklahoma, second degree murder requires proof that the defendant caused the death of another: (1) "by an act imminently dangerous to another person," (2) "evincing a depraved mind, regardless of human life," and (3) "without any premeditated design to effect the death of any particular individual." Okla. Stat. tit. 21, § 701.8(1) (1976). The state charged Mr. Thompson under a theory of aiding and abetting, which occurs when the defendant "procured [the crime] to be done, or aids, assists, abets, advises or encourages the commission of the crime." *Powell v. State*, 995 P.2d 510, 524 (Okla. Crim. App. 2000) (quoting *Conover v. State*, 933 P.2d 904, 910–11 (Okla. Crim. App. 1997), *abrogated on other grounds by Bosse v. Oklahoma*, 137 S. Ct. 1 (2016)).

9

Applying the standard from *Jackson*, the OCCA reviewed all of the evidence before the jury and, after "accepting all reasons, inferences, and credibility choices tending to support the verdict," concluded there was sufficient evidence "for a rational jury to conclude beyond a reasonable doubt that [Mr.] Thompson drove the car from which the fatal gunshot was fired and that he had knowledge of his co-defendant's intent to use a firearm in extreme disregard for human life." App. at 450. Mr. Thompson challenges the sufficiency of the evidence supporting either of those determinations.

Although Mr. Thompson presents his challenge under both § 2254(d)(1) and (d)(2), only an analysis under § 2254(d)(1) is necessary because the OCCA did not make any findings of historical fact with regard to its discussion of the sufficiency of evidence. *See Gilson v. Sirmons*, 520 F.3d 1196, 1233–34 (10th Cir. 2008) (noting that § 2254(d)(2) only applies to historical facts). Instead, the OCCA decided the ultimate mixed question that the evidence was sufficient for a jury to find Mr. Thompson guilty beyond a reasonable doubt. *Cf. Saiz v. Burnett*, 296 F.3d 1008, 1012 n.2 (10th Cir. 2002) (noting the ultimate harmless error conclusion should be reviewed under § 2254(d)(1) rather than (d)(2) because it is a mixed question).

In reviewing Mr. Thompson's sufficiency of the evidence claim, we address his contentions in turn. First, we consider whether the evidence supported a finding, beyond a reasonable doubt, that Mr. Thompson drove the white car from which the fatal shot was fired. In light of the record evidence, viewed in the light most favorable to the jury's verdict, we conclude the OCCA's determination that the evidence is sufficient is not contrary to, or an unreasonable application of, federal law. Next, we consider the record

10

evidence concerning whether Mr. Thompson knew of Mr. Richardson's intent to use a firearm in extreme disregard for human life. Taking that evidence and the reasonable inferences the jury could draw from it, we again conclude the OCCA's decision that the evidence is sufficient is not contrary to, or an unreasonable application of, federal law. Accordingly, we affirm the district court's denial of relief on the sufficiency of the evidence claim.

a. *Mr. Thompson drove the car*

Mr. Thompson makes two separate attacks on the sufficiency of the evidence offered to show he drove the white car on the night of the murder. First, he challenges the credibility of the witnesses who provided the testimony that implicated him. Second, he contends the evidence is insufficient because there is no physical evidence connecting him to the crime. We consider each of these arguments in turn, beginning with his claim that Mr. Thrower's and Ms. Banton's testimony is inherently incredible.

Mr. Thompson notes, "*only* [Mr.] Thrower could identify Mr. Thompson as driving the vehicle that fired the fatal shot," but Mr. Thrower's identification occurred under highly suspicious circumstances. Petitioner's Br. at 20. Mr. Thrower testified on direct examination that he could not identify the driver of the white car from which the fatal shot was fired. During redirect the following day, however, Mr. Thrower identified Mr. Thompson as the driver of the white car. According to Mr. Thompson, Mr. Thrower's identification testimony should be afforded no evidentiary weight because Mr. Thrower spoke with the victim's father and smoked marijuana between his direct and

11

redirect testimony. Although we agree that Mr. Thrower's change in testimony was dramatic, we are not convinced it must be discounted entirely.

In analyzing the sufficiency of the evidence we must "view[] the evidence in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, and "presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any . . . conflict[ing] [inferences] in favor of the prosecution, and [] defer to that resolution," *McDaniel*, 558 U.S. at 133 (quoting *Jackson*, 443 U.S. at 326); *see also Matthews v. Workman*, 577 F.3d 1175, 1184 (10th Cir. 2009) ("As an appellate court on collateral review, we are not allowed to weigh conflicting evidence or consider the credibility of witnesses." (internal quotation marks omitted)). The credibility question is within the sole province of the jury and we must presume it resolved that question in favor of the prosecution. *See Matthews*, 577 F.3d at 1185 (highlighting inconsistencies with prior testimony "proves . . . that a rational juror *might not* accept" the new testimony but "doesn't show that a rational juror *could not* accept it, which is the question on which a sufficiency challenge necessarily must focus"); *see also United States v. Cardinas Garcia*, 596 F.3d 788, 794 (10th Cir. 2010) (recognizing, on direct appeal, that "we will overturn a jury's credibility determination and disregard a witness's testimony only if the testimony is inherently incredible—that is, only if the events recounted by the witness were impossible under the laws of nature or the witness physically could not have possibly observed the events at issue" (internal quotation marks omitted)).

The defense cross-examined Mr. Thrower on the dramatic change in his testimony, highlighting his conversation with Mr. Ingersoll's father and his drug use.

12

Thus, the jury had before it two versions of Mr. Thrower's testimony, both offered for the truth of the matter asserted. At that point, the jury had sole responsibility for assessing Mr. Thrower's credibility—specifically whether he was telling the truth when he identified Mr. Thompson as the driver of the white car from which the fatal bullet was fired. Based on the verdict, we must assume the jury found his identification credible. Accordingly we reject Mr. Thompson's invitation to exclude Mr. Thrower's identification from our analysis.[3]

Next, Mr. Thompson attacks Ms. Banton's testimony, noting that she initially gave statements to police that implicated him, but later retracted those statements and admitted she had lied to police. Mr. Thompson highlights that Ms. Banton denied making almost every statement Detective Lord attributed to her in his police report, including the statement that Mr. Richardson had implicated himself in the shooting when he visited her on the night of the murder. He also points to Ms. Banton's claim that Detective Lord and another detective threatened Ms. Banton with jail time and with losing her kids, told her to implicate Mr. Thompson and Mr. Richardson, and intimidated her by "hitting the table and everything else." App. at 676-77. Under these circumstances, Mr. Thompson contends Ms. Banton's testimony is inherently incredible.

---

[3] To the extent that Mr. Thompson raises similar credibility challenges with respect to Ms. Dotson's testimony, we reject them for the same reasons as the objections to Mr. Thrower's testimony—the assessment of witness credibility was within the province of the jury.

13

The State claims it called Ms. Banton with hope that she would testify under oath consistent with her initial statements to Detective Lord.[4] When she did not, the State offered Detective Lord's testimony for purposes of impeachment. Ms. Banton then claimed the interview with Detective Lord had been coercive and she had been forced to make the statements implicating Mr. Thompson and Mr. Richardson. In response and again for impeachment purposes, the State offered a portion of the video to refute Ms. Banton's characterization of the interview as coercive. Importantly, the trial court instructed the jury that evidence offered for impeachment purposes could not be considered for the truth of the matters asserted. Because that evidence was admitted only for impeachment purposes, we do not consider it in assessing the sufficiency of the evidence.

In summary, the jury is charged with making credibility determinations. Here, the jury was aware of the two versions of Mr. Thrower's testimony. And because the defense was permitted to cross examine Mr. Thrower, the jury also knew Mr. Thrower discussed his testimony with Mr. Ingersoll's father before he identified Mr. Thompson as the driver of the white car. Indeed, defense counsel also briefly explored Mr. Thrower's drug use on the day of his direct examination. The jury could have believed Mr. Thrower lied on direct examination because he was frightened of retaliation but then told the truth on redirect when he identified Mr. Thompson. Taken in the light most favorable to the

_____

[4] We address Mr. Thompson's argument that the State, in fact, knew Ms. Banton would testify as she did and offered her testimony solely for the purposes of putting the impeachment evidence before the jury in Section II.C.1.a.

prosecution, Mr. Thrower's affirmative identification of Mr. Thompson as the driver of the white car is itself sufficient to conclude the OCCA did not unreasonably apply federal law when concluding the evidence is sufficient to support the jury's finding that Mr. Thompson drove the car from which the fatal shot was fired. But because Detective Lord's testimony was offered only for the purpose of impeaching Ms. Banton, we do not consider any of the statements he attributed to Ms. Banton in analyzing the sufficiency of the evidence.

The second argument Mr. Thompson makes with respect to the sufficiency of the evidence is that there is no physical evidence tying him to the white car or the fatal bullet. Instead, he contends the only physical evidence suggested Mr. England was the shooter. Recall that the shell casing found on MacArthur Boulevard was fired from the same gun as a shell casing found in Mr. England's car. But physical evidence is not required to sustain a conviction—the Supreme Court "ha[s] never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). Again Mr. Thompson fails to view the evidence in the light most favorable to the prosecution. There was inconsistent testimony at trial regarding whether the shooter fired one or two shots on the night of the murder. The jury could have found the shooter fired only one shot, explaining the single shell casing found on MacArthur Boulevard. The jury was also free to believe the testimony accounting for the shell casing found in Mr. England's car—that Mr. England sold guns to gang members and likely possessed and fired the gun prior to selling it to Mr. Richardson.

15

In conclusion, the evidence is sufficient to support the jury's finding, beyond a reasonable doubt, that Mr. Thompson drove the white car from which the shot was fired. As discussed, Ms. Dotson described seeing Mr. Thompson in the Fritzi's parking lot getting into the driver's seat of a white car, and Mr. Richardson getting into the passenger seat. Around the same time, Mr. Thrower, Mr. Newton, and Mr. Ingersoll were in the Buick trying to exit from the Fritzi's parking lot. Mr. Thrower testified that after the near collision between the white car and the Buick, the same white car followed the Buick and, upon drawing abreast to it, someone in the white car fired the shot that killed Mr. Ingersoll. And Mr. Thrower identified Mr. Thompson as the driver of that white car.

b. *Mr. Thompson had knowledge of Mr. Richardson's intent to use the gun*

Mr. Thompson next argues that even if there is sufficient evidence to prove he was driving the white car, the evidence does not support a finding that he knew Mr. Richardson possessed a gun and was planning to use it in extreme disregard for human life. Mr. Thompson acknowledges, "the firing of a weapon into an occupied vehicle constitutes imminently dangerous conduct." Petitioner's Br. at 18. He claims, however, that Mr. Richardson could have concealed the handgun and fired the single shot without Mr. Thompson having any knowledge of Mr. Richardson's plan or having the ability to stop it.

Again Mr. Thompson fails to view the evidence in the light most favorable to the verdict. The testimony at trial established that the white car almost hit the Buick, resulting in Mr. Ingersoll leaning out the Buick window, while yelling and flashing gang signs at the white car. According to Mr. Thrower, Mr. Thompson, the driver of that white

16

car, then started following the Buick and driving suspiciously, speeding up and slowing down. Mr. Thrower found this behavior to be strange enough that he warned his friends about the car before the shooting occurred. Mr. Thrower saw the car then speed up alongside the Buick, and he observed the passenger fire the shot that killed Mr. Ingersoll.

Viewing this evidence in the light most favorable to the prosecution, the district court identified the reasonable inferences a jury could draw from this testimony: "(1) [Mr. Thompson] and [Mr. Richardson] had an altercation with Mr. Thrower and Mr. Ingersoll while leaving the parking lot at Fritzi's nightclub; (2) [Mr. Thompson] followed Mr. Thrower and Mr. Ingersoll, speeding up and slowing down; and (3) [Mr. Thompson] had pulled his car up to Mr. Thrower and Mr. Ingersoll's car when [Mr. Richardson] fired." App. at 180–81. The jury could also infer that if Mr. Thrower found the vehicle's behavior suspicious enough to warn his friends, then the driver (Mr. Thompson) also must have been aware of what was about to happen.

Taking the evidence and the inferences therefrom in the light most favorable to the verdict, the OCCA's determination that a rational trier of fact could find beyond a reasonable doubt that Mr. Thompson knew Mr. Richardson had a gun and was planning to use it in extreme disregard for human life is not objectively unreasonable. We therefore affirm the district court's denial of Mr. Thompson's habeas petition based on the sufficiency of the evidence.

### C.  *Admission of Ms. Banton's Recanted Statements*

Mr. Thompson raises two general challenges to Detective Lord's testimony reporting Ms. Banton's interview statements. First, he alleges the admission of Detective

17

Lord's testimony violated his due process rights. Second, he claims the admission of Mr. Richardson's inculpatory statement to Ms. Banton, both through Detective Lord's testimony and the video, violated Mr. Thompson's Confrontation Clause rights. We affirm the district court's denial of habeas relief on both claims.

1. **Due Process Violations**

Mr. Thompson makes two due process arguments on appeal: (1) the prosecution called Ms. Banton for the sole purpose of impeaching her with unsworn statements that would be sufficient to convict him, thereby violating his due process rights (unsworn statement claim) and (2) the prejudicial nature of the impeachment evidence was so high that it rendered his trial fundamentally unfair (fundamental fairness claim).

We are not convinced Mr. Thompson's due process arguments are actually separate. In the sole case on which Mr. Thompson relies for his first due process argument, *United States v. Shoupe*, the Sixth Circuit was tasked with determining whether the prosecutor's use of prior unsworn, inconsistent statements "went beyond the permissible limits of fairness." 548 F.2d 636, 643 (6th Cir. 1977). Specifically, the issue in *Shoupe* was whether statements in an otherwise inadmissible report, used ostensibly to refresh the witness's recollection, could serve as the only evidence of guilt. The Sixth Circuit held it could not because to do so would "abridge[] defendants' right to a fair trial in violation of the Due Process Clause of the 5th Amendment." *Id.* at 643. Thus, despite Mr. Thompson's insistence that his unsworn statement and fundamental fairness arguments are distinct claims, a fair reading of *Shoupe* indicates that the ultimate question there was whether the trial court's evidentiary error rendered the trial so fundamentally

18

unfair as to violate due process. *Id.* As a result, *Shoupe* merely illustrates one way in which a trial can be deemed fundamentally unfair and a due process violation can be established.

We nonetheless consider Mr. Thompson's due process arguments separately, because he has conceded review under AEDPA deference for only part of the analysis. Mr. Thompson argues that his unsworn statements claim was not decided on the merits by the OCCA and, therefore, AEDPA deference should not apply. If Mr. Thompson is correct, we review his first due process claim de novo. *See Johnson v. Williams*, 568 U.S. 289, 301–02 (2013). Conversely, Mr. Thompson concedes that his fundamental fairness claim was decided by the OCCA and is thereby entitled to AEDPA deference. Petitioner's Br. at 42. He has therefore waived any argument that AEDPA deference does not apply to that second question. *Cf. Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009). As a result, we must review Mr. Thompson's fundamental fairness claim under the deferential standards set forth in § 2254(d).

We limit our analysis of the first due process claim to the arguments as set out by Mr. Thompson—that he was convicted solely on the basis of unsworn testimony admitted under the guise of impeachment. And we reserve for our consideration of his second due process claim whether the impeachment evidence was so prejudicial as to have rendered the trial fundamentally unfair.

a. *Unsworn statement claim*

We begin with Mr. Thompson's claim that the State called Ms. Banton for the sole purposes of impeaching her with otherwise inadmissible unsworn statements. The district

19

court rejected this claim as one not raising a constitutional error. The parties dispute whether the OCCA decided this issue on the merits, and therefore whether we must review the OCCA's decision under the deference provided in § 2254(d). According to Mr. Thompson, the OCCA never reached this issue and we must review it de novo. The State disagrees and contends we must defer to the OCCA's merits decision resolving this claim against Mr. Thompson. We need not and do not resolve this dispute because even affording Mr. Thompson the more favorable de novo standard of review, his claim fails. *See Ellis v. Raemisch*, 872 F.3d 1064, 1089 (10th Cir. 2017) (declining to resolve disagreement between the parties over whether de novo or AEDPA deference review should govern because the petitioner failed under de novo review). We undertake that de novo analysis now.

Mr. Thompson claims the State had nothing to gain from Ms. Banton's testimony because she had previously recanted her statements to police and had denied ever making them during her sworn testimony in Mr. Richardson's trial. Mr. Thompson argues it was impermissible for the State to call Ms. Banton under these circumstances, and he spends a significant portion of his brief explaining that doing so was a violation of state and federal rules of evidence.

Mr. Thompson is correct that "[e]very circuit has said evidence that is inadmissible for substantive purposes may not be purposely introduced under the pretense of impeachment." *United States v. Peterman*, 841 F.2d 1474, 1479 n.3 (10th Cir. 1988). But we cannot grant habeas relief based merely on an alleged violation of state evidentiary rules. Under § 2254(a), habeas relief is available only if an applicant can

show "he is in custody in violation of the Constitution or laws or treaties of the United States." As we have previously recognized, "the admission or exclusion of impeachment evidence" is "[a] non-constitutional error" and we generally refuse to treat challenges to the admission of substantive evidence under the guise of impeachment as a due process issue. *United States v. Clifton*, 406 F.3d 1173, 1179 & n.3 (10th Cir. 2005) (quotation marks omitted). When "no particular constitutional guarantees are implicated, . . . evidentiary objections merely raise questions of state law and, therefore, are cognizable on habeas only if the alleged error was so grossly prejudicial [that it] fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Revilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002) (alteration in original) (internal quotation marks omitted).

Mr. Thompson argues that *Shoupe*, 548 F.2d 636, bridges the gap between an evidentiary error and a constitutional violation cognizable on habeas review.[5] It is true the Sixth Circuit held in *Shoupe*, "that the recitation by the prosecutor of the entire substance of a witness's disavowed, unsworn prior statements, which, if credited by the jury, would be sufficient to sustain a conviction, abridged defendants' right to a fair trial in violation of the Due Process Clause of the 5th Amendment." 548 F.2d at 643. But *Shoupe* is readily distinguishable from the present facts.

---

[5] Mr. Thompson spends most of his briefing on this issue discussing the admissibility of the impeachment evidence under state law. However, we consider a due process challenge to the admission of evidence "without regard to whether the evidence was properly admitted pursuant to state law." *Ochoa v. Workman*, 669 F.3d 1130, 1144 (10th Cir. 2012) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991)).

In *Shoupe,* the prosecution called a co-defendant, who had pleaded guilty, to provide testimony that the defendants then on trial had participated in the bank robbery. *Id.* Although the witness had previously implicated the defendants in unsworn statements to an FBI agent, he claimed not to remember who else had participated in the crime when on the stand. *Id.* at 639–40. The prosecutor then asked a series of leading questions that recounted the entire contents of the FBI agent's report of his interview with the witness, including the witness's identification of the defendants as participants in the bank robbery. *Id.* at 640–41. The recanted statements in the report were introduced solely through the prosecutor's questions. *Id.* The FBI agent testified only during voir dire and admitted that the statements recorded in his report were unsworn, had not been recorded by audio or video, were not recorded in his report until six days after the interview, and had never been reviewed or adopted by the witness. *See id.* at 640. The Sixth Circuit reversed the convictions, holding that the Due Process Clause prevented the defendants from being convicted solely on the basis of unsworn testimony. *Id.* at 643–44.

Since *Shoupe,* the Sixth Circuit has explained the narrowness of its holding. In *United States v. LaVictor*, it stated:

> Initially, we note that under Federal Rule of Evidence 607, any party, including the party that called the witness, may attack a witness' credibility. **In *Shoupe,* we recognized a limited exception to this general rule.** The government called a co-defendant to testify concerning his role in the criminal enterprise. During testimony, the prosecutor asked the co-defendant whether anyone accompanied him into the bank. When the witness failed to answer, the prosecutor sought to impeach him through an inconsistent statement by producing a memorandum prepared by a federal agent, never seen by the witness, which the government read from to allegedly refresh the witness's memory. **At no point did the witness acknowledge making the statements contained in the memorandum.**

22

**No other evidence tied the defendant to the crime.** Consequently, this Court held that the district court should have been alerted to the possibility that the memorandum 'lacked sufficient indicia of reliability to justify its blanket disclosure to the jury, even for a limited purpose.

848 F.3d 428, 452 (6th Cir. 2017) (emphasis added) (quoting *Shoupe*, 548 F.2d at 642).

The court in *LaVictor* concluded there was no need to depart from the general rule in that case because the witness there "testified under oath," "acknowledged making the written statement and affirmed the veracity of its content." *Id.* at 452. And unlike in *Shoupe,* the trial court gave a limiting instruction to the jury. *Id.*

Here, Ms. Banton did not claim she had no memory of the interview. Although she first denied she made the statements to Detective Lord, she later stated she had been coerced and threatened and that she had a motive to lie to Detective Lord. Although she never expressly admitted she made the initial statements, her response strongly suggested as much. Both Ms. Banton and Detective Lord also testified under oath and were subjected to cross examination. *See Shoupe,* 548 F.2d at 643 ("Physical availability at trial of the out-of-court declarant, who is not otherwise insulated from cross-examination . . . may suffice to satisfy Sixth Amendment constraints."). And unlike in *Shoupe,* the reliability of Detective Lord's testimony was supported by a video of the interview with Ms. Banton, which presumably provided the district court sufficient indicia of the reliability of Detective Lord's testimony.[6] The trial court here also properly

---

[6] Only a portion of the video was played for the jury and the video is not part of the record on appeal. The burden to provide a record sufficient to facilitate appellate review falls on the appellant. *See United States v. Brody*, 705 F.3d 1277, 1280 (10th Cir. 2013); *see also* 10th Cir. R. 10.1(A)(1) ("The appellant must provide all portions of the transcript necessary to give the court a complete and accurate record of the proceedings

23

instructed the jury, both before the video was played and before the jury began its deliberations, that impeachment evidence could be considered only for purposes of assessing credibility. Further, although "[n]o other evidence tied the defendant to the crime," in *Shoupe, see LaVictor*, 848 F.3d at 452, Ms. Banton's testimony was not the only evidence that tied Mr. Thompson to the shooting of Mr. Ingersoll. As discussed, Mr. Thrower identified Mr. Thompson as the driver of the car from which the fatal shot was fired and Ms. Dotson saw Mr. Thompson and Mr. Richardson enter a white car that met the description of that vehicle in the Fritzi's parking lot.

Unlike in *Shoupe,* the unsworn statements from Ms. Banton are not sufficient, standing alone, to find Mr. Thompson guilty. Mr. Thompson focuses on the following statements admitted as impeachment evidence: (1) Ms. Banton saw Mr. Thompson and Mr. Richardson in a white Camaro, (2) Mr. Richardson was acting nervously during a conversation with Ms. Banton soon after the shooting, and (3) Mr. Richardson told Ms. Banton, "he just shot a dude in the head but wasn't sure or certain if he was dead or alive." Petitioner's Br. at 27 (quoting App. at 876). As discussed above, the State was required to prove Mr. Thompson drove the car from which the fatal shot was fired and that Mr. Thompson knew of Mr. Richardson's intent to use a gun in extreme disregard for

related to the issues on appeal."). Where the record is incomplete, we may assume the regularity of the proceedings below. *See United States v. Arevalo-Tavares,* 210 F.3d 1198, 1200 (10th Cir. 2000) (citing *Parke v. Raley,* 506 U.S. 20, 30-31 (1992)). Here, this presumption is warranted. If the video had discredited Detective Lord's testimony, it is highly unlikely the district court would have permitted him to testify as to Ms. Banton's prior statements, and it is highly likely the defense would not have objected to the video being played to the jury.

human life. Although the impeachment evidence would help a jury reach those conclusions, they are insufficient on their own to sustain the verdict. Testimony that Mr. Thompson was seen driving a white Camaro does not prove he was driving the car from which the fatal shot was fired, without the testimony from Mr. Thrower that the shot was fired from a white car similar to a Camaro. And testimony that Mr. Richardson fired the shot is not sufficient to prove Mr. Thompson was driving the car at the time, or that he knew Mr. Richardson intended to shoot at the Buick. That inference is supported by testimony from Mr. Thrower about the near collision, Mr. Ingersoll's taunting reaction, the subsequent pursuit of the Buick by the white car, the erratic operation of the white car, and the shot from that car once it drew abreast of the Buick. The impeachment evidence, on its own, would not be sufficient to sustain Mr. Thompson's conviction, even if the jury had ignored the court's instructions and considered that evidence substantively.

This is not a case that violates "the principle that [a] man should not be allowed to be convicted on the basis of unsworn testimony," *Shoupe,* 548 F.2d at 643–44. Therefore, Mr. Thompson's due process argument under *Shoupe* fails under de novo review.

b. *Fundamental fairness claim*

In his second due process challenge, Mr. Thompson contends that, even if not dictated by *Shoupe*, the impeachment evidence was so prejudicial that its admission rendered his trial fundamentally unfair. [7] He therefore claims the OCCA's determination

---

[7] Citing *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980), and *Vitek v. Jones*, 445 U.S. 480, 488 (1980), Mr. Thompson also argues a due process violation because the OCCA's failure to correctly apply title 12, section 2403 of the Oklahoma Statutes, was contrary to federal law. But these cases stand for the narrow proposition that when

25

that the impeachment evidence was not unduly prejudicial was an unreasonable application of, or contrary to, *Romano v. Oklahoma*, 512 U.S. 1 (1994). Under *Romano*, when the case is "not one in which the State ha[s] denied a defendant the benefit of a specific constitutional right," the appropriate question is whether the evidence "so infected the trial with unfairness as to make the resulting conviction a denial of due process." 512 U.S. at 12 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "[B]ecause a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (alteration in original) (internal quotation marks omitted).

The OCCA concluded the evidence was offered for its impeachment value and not as substantive proof. Without any analysis, Mr. Thompson argues this is an unreasonable factual determination. Even if we were willing to ignore that this argument was not raised or decided below, and were also willing to apply his Confrontation Clause arguments to his due process challenge, Mr. Thompson could not meet his burden to show the OCCA's finding was unreasonable. First, with regard to the video interview, the OCCA determined it was offered for impeachment purposes because it was offered during

state statutes create liberty interests those interests are entitled to due process protections. *Vitek*, 445 U.S. at 488 ("We have repeatedly held that state statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment."); *Hicks*, 447 U.S. at 346 (concluding when a state statute creates a liberty interest "that liberty interest is one that the Fourteenth Amendment preserves against arbitrary deprivation by the State"). Because Mr. Thompson has not argued § 2403 creates a liberty interest, he cannot succeed on this argument.

26

Detective Lord's testimony to rebut Ms. Banton's claim of threats and coercion during the interview. Immediately before playing the video, the court instructed the jury that

> [t]his tape is not going to be played in its entirety and it's not for the truth of the matter asserted, it's just to show the atmosphere under which [it] was created at that date and for you to make a determination as to the voluntariness of the statement, that's all, that's the only reason.

App. at 890–91. Against this backdrop, the OCCA's factual determination was not unreasonable.

Second, we reject Mr. Thompson's argument that the OCCA made an unreasonable determination of fact when it found that Mr. Richardson's purported confession to Ms. Banton was offered for impeachment purposes. The OCCA found Detective Lord's testimony about what Ms. Banton told him Mr. Richardson said to her on the night of the shooting "obviously was offered for its impeachment value" because it was "elicited during a series of questions [posed to Detective Lord] designed to rebut many portions of [Ms.] Banton's testimony." App. at 451. Mr. Thompson points to an ambiguous statement in a sidebar colloquy and comments made during the prosecution's closing argument that appear to use the impeachment evidence substantively to argue this determination was unreasonable. To the extent Mr. Thompson is challenging improper closing argument, he cannot use his due process claim to bootstrap in an unpreserved prosecutorial misconduct claim. And the sidebar comments are too vague to advance either side of the argument. "[A]n imperfect or even an incorrect determination of the facts isn't enough for purposes of § 2254(d)(2)." *Grant*, 727 F.3d at 1024.

Our review of the record supports the OCCA finding. During Ms. Banton's testimony she was asked a series of questions about the statements she made to Detective Lord. Each time she denied having made a statement, she was asked whether Detective Lord's report would be inaccurate if it attributed the statement to her. And on every occasion, she replied it would be inaccurate. In turn, the State questioned Detective Lord about the statements Ms. Banton denied having made, allowing him to contradict her testimony. This is classic impeachment. Mr. Thompson has thus not met his weighty burden of proving the OCCA made an unreasonable determination of fact.

Nor is the OCCA's decision an unreasonable application of federal law. Given the discrepancies between Ms. Banton's testimony and Detective Lord's testimony about what was said and whether Ms. Banton was threatened during the interview, the OCCA found the probative value of the impeachment evidence relatively high. In his briefing before the OCCA, Mr. Thompson admitted the impeachment evidence had probative value. And as the OCCA noted, the trial court properly instructed the jury to consider the impeachment evidence only for credibility purposes, reducing the danger of unfair prejudice. Generally, "[a] jury is presumed to follow its instructions." *United States v. Berry*, 717 F.3d 823, 832 (10th Cir. 2013). The OCCA also indicated why the impeachment evidence was probative, highlighting the dispute between Detective Lord and Ms. Banton about the tenor of the interview. *Cf. Duckett*, 306 F.3d at 999 (emphasizing that the OCCA had identified several ways in which the challenged evidence was probative).

Having reviewed the record as a whole, we agree with the district court that it was not objectively unreasonable for the OCCA to conclude the impeachment evidence did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Romano*, 512 U.S. at 12 (quoting *Donnelly*, 416 U.S. at 643). We therefore affirm the district court's denial of habeas relief on this ground.

## 2. Confrontation Clause Violation

Mr. Thompson alleges his Confrontation Clause rights were violated when Detective Lord was permitted to testify that Ms. Banton reported in her interview that Mr. Richardson visited her apartment the night of the murder and told her he had just shot someone in the head. The OCCA concluded there was no Confrontation Clause violation because (1) the testimony was offered only for impeachment purposes and (2) the Confrontation Clause does not bar the use of testimonial statements for purposes other than the truth of the matter asserted. The district court agreed with the OCCA and also concluded that Mr. Richardson's statement to Ms. Banton was nontestimonial.

Mr. Thompson challenges the OCCA's determination under § 2254(d)(2), arguing the OCCA made an unreasonable factual determination when it concluded the testimony was offered only for impeachment purposes. Mr. Thompson also challenges the district court's conclusion that the statement was nontestimonial, but he does not argue the OCCA incorrectly applied the law in holding that the Confrontation Clause bars only the use of testimonial statements offered for the truth of the matter asserted. We can easily dispose of Mr. Thompson's Confrontation Clause argument because, as the district court concluded, Mr. Richardson's statement to Ms. Banton was nontestimonial. *See Byrd v.*

29

*Workman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (If we conclude the state court's decision was based on an unreasonable determination of fact, "we would still be left to review [the constitutional claim] de novo.").

The Confrontation Clause applies only to testimonial hearsay. *Davis v. Washington*, 547 U.S. 813, 823–24 (2006). A statement is testimonial if "in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 135 S. Ct. 2173, 2180 (2015) (alteration in original) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). In this regard, "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Davis*, 547 U.S. at 824 (quoting *Crawford v. Washington*, 541 U.S. 36, 51 (2004)). Therefore, "statements made unwittingly to a Government informant" or "statements from one prisoner to another" are "clearly nontestimonial." *Id.*; *see also United States v. Smalls*, 605 F.3d 765, 779–80 (10th Cir. 2010) (holding statements made to confidential informant posing as a fellow inmate and "apparent friend" were "undoubtedly nontestimonial under any legitimate view of the law").

Mr. Richardson's statement to Ms. Banton was undoubtedly nontestimonial. The primary purpose of Mr. Richardson's conversation with Ms. Banton was not to create an out-of-court substitute for trial testimony. Mr. Thompson recognizes as much, conceding that "[Mr.] Richardson's statements to [Ms.] Banton could be classed by the Court as nontestimonial." Petitioner's Br. at 42. Instead, he argues that we must focus on the "peculiar scenario" at issue here involving "[Ms.] Banton's testimonial statements to

30

police and [Mr.] Richardson's arguably nontestimonial statements to [Ms.] Banton." *Id.* at 43.

There is a fatal flaw in Mr. Thompson's argument—the testimonial nature of Ms. Banton's statement to Detective Lord does not change the nontestimonial nature of Mr. Richardson's statement to Ms. Banton. Moreover, Mr. Thompson has argued a violation of his right to confront Mr. Richardson, not a violation of his right to confront Ms. Banton.[8] Because Mr. Richardson's statement to Ms. Banton was nontestimonial, the admission of that statement did not violate Mr. Thompson's right to confront Mr. Richardson. As a result, even under a de novo standard of review, Mr. Thompson is not entitled to relief on his Confrontation Clause claim.[9]

---

[8] To the extent Mr. Thompson is arguing the violation of his right to confront Ms. Banton, the Confrontation Clause provides him no protection. In *Crawford v. Washington*, the Supreme Court "reiterate[d] that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." 541 U.S. 36, 59 n.9 (2004). Ms. Banton was subject to cross-examination at trial and was specifically asked on direct examination about whether she told Detective Lord that Mr. Richardson said he had shot someone in the head.

[9] Mr. Thompson also challenges the admission of an unspecified statement contained in a video of Detective Lord's interview with Ms. Banton into evidence on Confrontation Clause grounds. Mr. Thompson admits "the record fails to bear out what portions of the interrogation were actually played for the jury." Petitioner's Br. at 46. Instead, he surmises that "the record is clear that objectionable portions were played," and "[w]hatever these objectionable statements were, Mr. Thompson had no means to confront [Ms.] Banton, *or whomever the declarant may have been*, about them." *Id.* at 46–47 (emphasis added).

The OCCA concluded the video was offered for impeachment and it thus did not violate Mr. Thompson's confrontation rights. The district court also rejected Mr. Thompson's claim because he could not show how the portions of the tape that were played actually implicated him.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's denial of

Mr. Thompson's petition for habeas relief.

Entered for the Court


Carolyn B. McHugh
Circuit Judge

---

We agree with the district court—Mr. Thompson cannot show a Confrontation Clause violation at all, let alone meet his burden of showing the OCCA made an unreasonable determination of fact or unreasonably applied federal law by pointing to an unidentified statement made by an unidentified declarant.